In re WBQ PARTNERSHIP t/a
Brookwood Nursing Home,
Debtor-in-possession.

WBQ PARTNERSHIP, Plaintiff,

v.

COMMONWEALTH OF VIRGINIA DE-
PARTMENT OF MEDICAL ASSIS-
TANCE SERVICES, Defendant.

Bankruptcy No. 93–10586–AB.
Adv. No. 95–1246.

United States Bankruptcy Court,
E.D. Virginia, Alexandria Division.

Oct. 3, 1995.

Madeline A. Trainor, Tyler, Bartl, Burke & Albert, P.L.C., Alexandria, VA, for the debtor.

Henry C. Su, Williams, Mullen, Christian & Dobbins, P.C., Richmond, VA, for DMAS.

Robert K. Coulter, Assistant United States Attorney, Alexandria, VA, for the IRS.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Chief Judge.

The case at bar presents two questions for decision: whether the Chapter 11 debtor may sell nearly all its assets under 11 U.S.C. § 363(f) before filing a disclosure statement and liquidation plan, and if the sale is permissible under § 363(f), whether the Court can enjoin a creditor of the debtor from initiating a collection action against the third-party buyer. As to the first question, the debtor, WBQ Partnership, has moved to sell virtually all its assets, as part of its decision to liquidate under Chapter 11. Two creditors of the debtor, the Internal Revenue Service ("IRS") and the Virginia Department of Medical Assistance Services ("DMAS"), have objected to the merits of the proposed sale. For the reasons that follow, we overrule these objections, and approve the sale proposed by the debtor.

As to the second question, DMAS contends that it can collect a portion of the gain realized from the sale pursuant to Va.Code Ann. § 32.1–329 (Michie 1992). Significantly, this Virginia statute authorizes DMAS to collect or "recapture" the gain either from the debtor, or if the debtor fails to pay DMAS, from the person buying the assets. By allowing DMAS to proceed against the buyer, we find that the Virginia statute conflicts with § 363(f) of the Bankruptcy Code, which authorizes a trustee to sell property free and clear of liens and other interests. Relying on the Supremacy Clause [1] and § 105(a) of the Bankruptcy Code, we permanently enjoin DMAS from exercising its statutory rights against the buyer, as explained more fully below.

### I.

The material facts are undisputed. For nearly 20 years, the debtor has operated a nursing home located in Stafford, Virginia, and has received Medicaid payments from DMAS, the state agency responsible for administering the federal Medicaid program in the Commonwealth of Virginia. The Medicaid program provides money to states which, in turn, enables them to fund medical treatment for the poor. *See* 42 U.S.C. § 1396. To receive Medicaid funding, a state must submit to the U.S. Secretary for Health and Human Services a "plan for medical assistance," *id.* § 1396a, which is "required to establish, among other things, a scheme for reimbursing health care providers [such as nursing homes] for the [costs of] the medical services provided to" Medicaid-qualified pa-

---

1. The Supremacy Clause of the United States Constitution provides that the "Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

tients. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990).

Among the costs reimbursable under Virginia's plan is the depreciation of a nursing home's tangible assets. Similar to other states, Virginia "calculates depreciation according to a standard accounting method, dividing an asset's purchase price (say, $300,-000) by its estimated useful life (say, 30 years), and reimbursing the facility for the resulting annual depreciation ($10,000 each year for 30 years)." *Hoodkroft Convalescent Ctr. v. New Hampshire Div. of Human Servs.,* 879 F.2d 968, 969 (1st Cir.1989) (interpreting an equivalent provision in New Hampshire), *cert. denied,* 493 U.S. 1020, 110 S.Ct. 720, 107 L.Ed.2d 740 (1990). Upon the sale of the asset, section 32.1–329 of the Virginia Code authorizes DMAS to "recapture" the depreciation it paid "to the extent that the sale price exceeds the depreciated original cost of the asset (*i.e.,* the original purchase price less all depreciation payments made before the sale)." *Id.* at 969–70 (citing Va.Code Ann. § 32.1–329 (Michie 1988)).

Returning to the illustration supplied in *Hoodkroft Convalescent Center, supra,* assume that over 15 years, DMAS pays a total reimbursement of $150,000 to the nursing home for the wear-and-tear of the asset. The asset's cost basis is thus reduced to $150,000 ($300,000 less $150,000). Assume further that the nursing home sells the asset to another nursing home for $500,000. Under the Virginia statute, DMAS may recover or "recapture" $150,000 as a depreciation overpayment, as indicated above. Va.Code § 32.1–329(A). If the seller fails to reimburse DMAS for the recaptured depreciation, DMAS will deem the sale "ineffective" as to the Commonwealth of Virginia. At that point, DMAS may collect the recaptured depreciation using "any means available by law." *Id.* § 32.1–329(C). Such "means" in-

clude an action for attachment or levy, and most importantly, exercising a setoff against the Medicaid payments that would be owed to the buyer, as the new owner of the nursing home. *See id.* § 32.1–329(C) & (D).

The dispute at hand arises from the debtor's motion to sell its nursing home free and clear of DMAS's recapture rights. The nursing-home facility itself is situated on real property owned by Michael and Sherill Quigley, and William and Shirley Bagley. The debtor is a partnership comprised of Michael Quigley and William Bagley, and it owns the personal property connected with the nursing home. On February 11, 1993, the debtor filed for Chapter 11 relief under the Bankruptcy Code. According to the documents filed in this case, three deeds of trust encumber the real property. The first-priority trust secures a total indebtedness of $133,-000, while two second-priority trusts secure a total indebtedness of $33,000. Additionally, the IRS asserts a claim totaling $426,834, a portion of which ($260,201) is secured by tax liens.

After filing its Chapter 11 petition, the debtor submitted a proposed disclosure statement and plan of reorganization. DMAS subsequently decreased the level of reimbursement it was paying the debtor, which in turn, reduced the amount of income that the debtor was receiving postpetition.[2] According to the debtor, DMAS's action made the plan unconfirmable, and prompted the debtor to withdraw it. In an effort to resolve this Chapter 11 case, the debtor has decided to sell nearly all its assets, and divide the sale proceeds among its creditors pursuant to a liquidation plan that has not yet been filed. The debtor has thus entered into an asset-purchase agreement with Gilron, Inc.[3] Under this agreement, which has not yet been approved by the Court, Gilron will buy the real property and the debtor's assets free and clear of liens and other interests, and the

---

**2.** *See* Tr. of Aug. 1, 1995, at 6, 26–29; Memorandum and Brief in Support of Debtor's Motion to Sell Property Free and Clear of Interest, Liens and Encumbrances, at 7. According to the debtor, the decline in income resulted from DMAS's efforts to offset its prepetition claims against the postpetition Medicaid payments owed to the debtor. The debtor has asserted these allegations in a motion for entry of a show-cause order.

In the context of this proceeding, however, we are not required to determine whether DMAS's conduct has violated the automatic stay.

**3.** Gilron is a corporation whose principal is Ronald Bailey, the current manager of the debtor's nursing home.

liens will attach to the proceeds resulting from the sale. The agreement, as amended, provides that Gilron will pay the purchase price entirely with cash.[4] After the sale is completed, Gilron intends to continue operating the facility as a nursing home. The debtor has asked this Court to approve the proposed agreement under 11 U.S.C. § 363(f). Both DMAS and the IRS have objected to the debtor's request.[5]

Turning to the purchase price, we note that a recent appraisal found the assets' "replacement-cost" value to be $785,000, their "going-concern" value to be $660,000, and their "as is" market value to be $515,000. The proposed agreement originally contemplated that Gilron would pay $700,000 for the assets, a price that exceeded their appraised going-concern value. DMAS subsequently determined, however, that the total amount of reimbursements it would pay to Gilron over time would be $515,000, which represents the "as is" market value of the assets, as mentioned above. DMAS's decision effectively reduced the purchase price to $515,-000.[6]

At this price, DMAS asserts that it is entitled to recapture a total of $196,000 in depreciation overpayments under Va.Code § 32.1–329. It is unlikely that DMAS will recover the entire $196,000 from the proceeds of sale, since DMAS concedes that its right of recapture is not a lien, and since a large portion of the assets already serve as collateral for the secured claims described above. Needless to say, the secured creditors must be paid in full before the unsecured creditors, such as DMAS, can receive

their *pro rata* share of the remaining proceeds. DMAS thus contends that it has authority under Va.Code § 32.1–329 to satisfy any remaining deficiency by exercising its rights against Gilron.

Gilron asserts, and DMAS concedes,[7] that should DMAS offset the "recaptured" depreciation against the Medicaid payments owed to Gilron, Gilron would lose the level of income necessary to operate the nursing home efficiently and economically. Accordingly, Gilron is not willing to complete the sale if DMAS is permitted to exercise its rights under Va.Code § 32.1–329. The debtor contends that, if the sale is not consummated, there will be no hope of presenting a confirmable plan, and consequently, the debtor will be forced to either dismiss its case or liquidate under Chapter 7. It is undisputed that either outcome would compel the debtor to close its nursing home, dismiss all its employees, and release all its patients. The debtor asserts that closing the nursing home would impose a significant burden on the patients and their families, for the closest nursing home is twenty miles away, and it has no available beds to accommodate the patients released from the debtor's facility. In the debtor's view, the only available prospect for confirming a plan, and keeping the nursing home open, is to issue an injunction that forbids DMAS from exercising its rights against Gilron. The debtor has thus commenced this adversary proceeding, asking the Court to enjoin DMAS in conjunction with approving the proposed sale. In response, DMAS has moved for summary judg-

4. One memorandum filed by the debtor recites, "The original contract was amended to eliminate any reference to the financing of the purchase price, and it is now an all-cash purchase price." Memorandum, *supra* note 2, at 2; *see also* Complaint ¶ 8.

5. The holders of the first-priority deed of trust and the County of Stafford, Virginia, also objected to the proposed sale. The debtor has informed the Court, however, that these creditors have withdrawn their respective objections. Memorandum, *supra* note 2, at 2. In addition, the IRS has indicated recently that it will consent to the sale, but it has also expressed that it will ask the debtor to adjust certain terms contained in the proposed sale order. Because the IRS has neither formally nor unequivocally withdrawn its

objection, we are compelled to address the arguments raised in its written argument opposing the sale.

6. Apparently, one proposed solution was to have Gilron pay $700,000 for the assets, and of this sum, the debtor would pay $196,000 to DMAS for the recaptured depreciation. The debtor would then apply the balance of the proceeds to the remaining claims. DMAS has determined, however, that it will not allow a depreciation of more than $515,000, and perhaps understandably, Gilron is unwilling to pay $700,000 for assets that would command a reimbursement of only $515,000. *See* Tr. of Aug. 1, 1995, at 22–23.

7. Tr. of Aug. 1, 1995, at 18–19.

ment, or in the alternative, for dismissal of the debtor's complaint on grounds that it fails to allege a colorable claim. *See* Fed. R.Civ.P. 12(b)(6).

## II.

Before turning to the merits of the injunction and DMAS's motion, we must decide, as a threshold matter, whether the proposed sale satisfies the requirements of 11 U.S.C. § 363(f), since DMAS and the IRS have challenged the validity of the sale itself. Section 363(f) provides as follows:

> The trustee may sell property *under subsection (b)* or (c) of this section *free and clear* of any interest in such property of an entity other than the estate, *only if*—(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; *or* (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f) (emphasis added). As the phrase "under subsection (b)" suggests, a sale must satisfy the requirements of § 363(b) before it can be approved under § 363(f). We accordingly turn to the language of § 363(b).

## A.

■ In relevant part, § 363(b) provides that, following notice and an opportunity to be heard, a trustee or a debtor-in-possession "may use, sell, or lease, other than in the ordinary course of business, property of the estate." *Id.* § 363(b)(1). By its terms, § 363(b) does not require a Chapter 11 debtor to propose a plan of reorganization before it moves to sell its assets outside the ordinary course of business. Nevertheless, to prevent debtors from using § 363(b) as a vehicle for circumventing the creditor protec-

tions afforded under Chapter 11, the courts have imposed their own requirements for allowing liquidation sales before plan confirmation. At least one circuit has confined such sales "to emergencies where there is imminent danger that the assets of the ailing business will be lost if prompt action is not taken." *In re Solar Mfg. Corp.*, 176 F.2d 493, 494 (3d Cir.1949).[8] More recent decisions have determined that pre-confirmation sales are permissible "when a sound business purpose dictates such action." *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir.1986); *see also Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir.1983). After reviewing the relevant authorities, we conclude that the "sound business purpose" test is the more sensible approach for providing creditors with a measure of protection outside the plan-confirmation process. We therefore adopt the line of decisions applying the sound business purpose test.

■ The sound business purpose test has four elements. A trustee or debtor-in-possession has the burden of proving that (1) a sound business reason or emergency justifies a pre-confirmation sale; (2) the sale has been proposed in good faith; (3) adequate and reasonable notice of the sale has been provided to interested parties; and (4) the purchase price is fair and reasonable. *In re Delaware & Hudson Rwy. Co.*, 124 B.R. 169, 176 (D.Del.1991); *see also In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220 (Bankr.N.D.Ohio 1994); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr.W.D.Pa. 1991).

As for the first element, which asks whether there is a sound business reason justifying a pre-confirmation sale, the debtor asserts that its business is suffering as a result of "minimal cash flow." The debtor also contends, without any contest or dispute, that it is unable to reorganize because it suffered a loss of income when DMAS decided to offset its claims against the postpetition Medicaid

---

**8.** One court has determined, however, that another Third Circuit decision, *In re Abbotts Dairies*, 788 F.2d 143 (3d Cir.1986), has "effectively overrule[d]" the holding in *Solar Manufacturing.*

*See In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr.E.D.Pa.1987).

reimbursements that were owed to the debtor. The debtor therefore implies that a § 363 sale is necessary to prevent the value of its assets from deteriorating as a result of its financial problems. *Cf. In re Channel One Communications, Inc.,* 117 B.R. 493, 496 (Bankr.E.D.Mo.1990). Additionally, the debtor points out that a pre-confirmation sale would relieve the debtor's estate of "accruing interest, property taxes and insurance escrows," thereby benefiting creditors.[9] We conclude that the debtor's undisputed assertions have presented a sound business reason for selling its property before plan confirmation, and accordingly, the debtor has satisfied the first element of the sound business purpose test.

■ We next consider whether the sale has been proposed in good faith. In this instance, a principal of Gilron, the proposed buyer, is the current manager of the debtor's facility, which raises the concern that the proposed sale might not be the product of an arm's length transaction. A negotiation conducted at arm's length helps to ensure that the agreed price ultimately will be fair and reasonable. Whether the purchase price here is fair and reasonable is the question we address below. For the moment, however, we consider the related question of whether the proposed sale involves disguised payments to insiders, perhaps in the form of consulting agreements and employment contracts that will benefit only the debtor's principals. *See* 1 David G. Epstein et al., *Bankruptcy* § 4-4, at 384–85 (1992). The IRS argues that the debtor's notice is defective inasmuch as it failed to divulge whether and to what extent the debtor's principals would be benefiting from the transaction. The IRS may be correct in this respect. But we find that the debtor cured this defect when its counsel assured us at a status hearing on September 19, 1995 that there are no collateral agreements benefiting the debtor's principals in connection with the proposed sale.

DMAS contends that the debtor is using the sale as a vehicle for nullifying its right of recapture. We are unpersuaded. After filing its Chapter 11 petition, the debtor submitted a proposed plan and disclosure statement, but later withdrew these documents because DMAS had reduced the level of Medicaid reimbursements paid to the debtor. In light of this circumstance, the debtor decided to attempt a "reorganization" in the form of inviting new equity to buy the business. To maximize the purchase price and enlarge the return to all creditors, the debtor has sought to enjoin DMAS from enforcing its recapture rights against the prospective buyer. Under these circumstances, we cannot find that the debtor has proposed this sale in bad faith.

■ The next issue we address is whether the debtor provided adequate and reasonable notice to interested parties. "Due process requires notice that is reasonably calculated, under the circumstances, to apprise an interested party of the pendency of an action." *Snug Enter., Inc. v. Sage (In re Snug Enter., Inc.),* 169 B.R. 31, 33 (Bankr. E.D.Va.1994) (citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314–15, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)). In this context, "notice is sufficient if it includes the terms and conditions of the sale, if it states the time for filing objections, and if the estate is selling real estate, it generally describes the property." *In re Karpe,* 84 B.R. 926, 929 (Bankr.M.D.Pa. 1988). Having reviewed the debtor's amended notice carefully, we conclude that all interested parties have received adequate and reasonable notice of the proposed sale. The amended notice generally describes the property to be sold, it discloses the purchase price and the manner of payment, and it fixes a time period for filing objections. Additionally, the amended notice identifies the proposed buyer, Gilron, Inc., and it properly divulges that a principal of Gilron, Ronald Bailey, is the current manager of the debtor's facility. The amended notice specifies that the assets will be sold free and clear of interests, and it explains that the debtor will seek to preclude DMAS from exercising its recapture rights under Va.Code § 32.1–329. Finally, we conclude that the detailed laundry list of "assets to be sold" reasonably

**9.** Debtor's Motion to Approve Asset Purchase Agreement, and to Sell Partnership Assets Free

and Clear of Liens, Claims, Encumbrances and Interests ¶ 14, at 6.

notifies interested parties that the debtor is seeking to liquidate under 11 U.S.C. § 363. For these reasons, we find the amended notice to be reasonable and adequate.

■ The final question we address is whether the proposed price is fair and reasonable. Citing the decisions of *Chmil v. Rulisa Operating Company (In re Tudor Associates, Ltd., II)*, 20 F.3d 115, 119 (4th Cir.1994), and *Willemain v. Kivitz (In re Willemain)*, 764 F.2d 1019, 1023 (4th Cir. 1985), the IRS contends that a proposed price is fair and reasonable if it constitutes at least 75% of the appraised value of the assets. The difficulty here is that neither *Tudor Associates* nor *Willemain* interpreted § 363(b). Rather, each of the cases involved an attack on a transfer that had already occurred, and the outcome of each case turned, in part, on whether the buyer was a bona fide or good-faith purchaser. Still, even if *Tudor Associates* and *Willemain* do supply the proper test for determining whether a price is fair and reasonable, we conclude that the price proposed here meets that test. In this instance, the proposed purchase price is $515,000, and as mentioned before, a recent appraisal found the replacement-cost value of the assets to be $785,000, the assets' going-concern value to be $660,000, and the assets' "as is" market value to be $515,000. Neither the IRS nor DMAS has challenged the numbers set forth in the appraisal. Relying on these numbers, we observe that the proposed price of $515,000 constitutes 78% of the assets' appraised going-concern value and 100% of their appraised "as is" market value. Under these circumstances, we conclude that the proposed price is fair and reasonable under the test set forth in *Tudor Associates* and *Willemain*.

The IRS indicates next that private sale agreements between a prospective buyer and a Chapter 11 debtor should be treated as suspect, and it implies further that a higher price for these assets could be gained at a public auction. *See In re Landscape Properties, Inc.*, 100 B.R. 445, 447–48 (Bankr. E.D.Ark.1988) (stating that an objection to a sale based simply on the fact that a higher offer exists must be sustained under certain circumstances); *In re Ohio Corrugating Co.*, 59 B.R. 11, 12 (Bankr.N.D.Ohio 1985) (holding that the method of sale providing the fullest measure of fairness is a public auction). By and large, we agree that a public auction can serve the interests of creditors more than a private deal reached between a Chapter 11 debtor and a prospective buyer. In the case at hand, however, we do not believe a public auction would command a higher price, given the unique situation presented here. Most significantly, DMAS has determined that the total amount of depreciation it will allow after the sale is $515,000. DMAS's decision has effectively imposed a ceiling on the value of the assets, since it is unlikely that any future nursing home would be willing to pay more than $515,000 for assets that will command a Medicaid reimbursement of only $515,000.

Even if the prospective buyer does not intend to treat Medicaid-qualified patients, it still must confront DMAS's right of recapture. As related above, if the sale produces a gain, the debtor must pay DMAS at least a portion of the gain, which will be designated as "recaptured depreciation." *See* Va.Code § 32.1–329(A). If the debtor fails to pay this sum, DMAS will deem the sale "ineffective" as to the Commonwealth of Virginia, and may then collect the recaptured depreciation, using "any means available by law," which includes an action for attachment or levy. *See id.* § 32.1–329(C) & (D). Of course, if the sale price is very low and there is no resulting gain, DMAS's right of recapture will not ensue. Accordingly, absent an injunction that forbids DMAS from exercising its statutory right of recapture, prospective buyers will have a tremendous incentive to bid a price so low that DMAS's right of recapture will not be invoked. For these reasons, we do not believe a public auction would produce a price appreciably higher than $515,000. We therefore find that the proposed price is fair and reasonable, and that the proposed sale satisfies the elements of the sound business purpose test under 11 U.S.C. § 363(b).

B.

■ Having found that the sale is permissible under § 363(b), we next consider

whether the sale may be accomplished free and clear of "any interest," as provided by 11 U.S.C. § 363(f). Initially, we emphasize that the tax liens held by the IRS qualify as an "interest" under § 363(f), since the Bankruptcy Code defines the term "lien" as a "charge against or *interest* in property to secure payment of a debt or performance of an obligation." *Id.* § 101(37) (emphasis added). Perhaps the more significant question is whether the term "interest" extends beyond liens, encompassing DMAS's right of recapture. Since "lien" is a defined term under the Bankruptcy Code, it stands to reason that Congress would have used the term "lien" instead of "interest," had it intended to restrict the scope of § 363(f) to liens. Furthermore, § 363(f)(3) applies to situations in which "such interest is a lien," which suggests that liens constitute a subcategory of "any interest." Other courts have indicated that the term "interest" is broad, covering more than mere liens. *See, e.g., American Living Sys. v. Bonapfel (In re All American of Ashburn, Inc.),* 56 B.R. 186, 189–90 (Bankr.N.D.Ga.), *aff'd per curiam,* 805 F.2d 1515 (11th Cir.1986); *In re Manning,* 37 B.R. 755, 759 (Bankr.D.Colo.1984), *aff'd in part and remanded,* 831 F.2d 205 (10th Cir.1987). We likewise conclude, for the reasons stated above, that the term "interest" extends beyond liens.

Additionally, DMAS's right of recapture falls within the category of "any interest" that is subject to § 363(f). As mentioned before, if the purchase price exceeds the asset's depreciated basis, DMAS may "recapture" at least a portion of the realized gain. *See* Va.Code § 32.1–329. If the seller fails to reimburse DMAS for the recaptured depreciation, DMAS may proceed to collect the recaptured depreciation from the purchaser. *Id.* § 32.1–329(C). In essence, DMAS's right of recapture runs with the property, so it is more than a mere claim against the debtor. DMAS's right of recapture is an "interest in property" insofar as it grants DMAS the right to proceed against the transferee. DMAS emphasizes that it has a "contingent" interest since its right of recapture depends on whether a gain is realized from the sale, and whether the seller reimburses DMAS for the recaptured depreciation. Yet the plain terms of § 363(f) refer to "*any* interest." Accordingly, DMAS's "contingent interest" is not exempt from the reach of § 363(f).

Section 363(f) enumerates five conditions for allowing a sale free and clear of interests. The "or" that precedes subsection (f)(5) indicates that the five conditions are phrased in the disjunctive, meaning that property may be sold free of an interest if that interest falls into only one of the five conditions. *In re Collins,* 180 B.R. 447, 450 (Bankr.E.D.Va.1995). As for the tax liens held by the IRS, the proposed sale is permissible under subsection (f)(3), which authorizes a sale free and clear of an interest when "such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property." 11 U.S.C. § 363(f)(3). There is a split of authority as to whether a price "greater than the aggregate value of all liens" means a price that exceeds the face amount of the liens encumbering the property, or alternatively, whether it means a price that exceeds the value of the liened property itself. One recent decision rendered in this district took the latter view, holding that a sale was permitted under § 363(f)(3) if the purchase price exceeded the value of the liened property. *Collins,* 180 B.R. at 451.

It could be argued, of course, that the situation at hand fails the *Collins* test since the purchase price merely equals the "as is" market value of the assets, and since the price is less than the going-concern value. But the court in *Collins* held that when the purchase price equals the value of the liened property, the sale is still permissible under § 363(f)(3) if the proposed price is the best obtainable under the circumstances, and if there are "special circumstances justifying a sale for less than the amount of the liens." *Id.* at 451. We have already determined that the price proposed in this instance is the best price obtainable under the circumstances. *See supra* part II.A. Additionally, it is unnecessary to decide whether "special circumstances" exist, since the proposed purchase price exceeds the face amount of the liens. Here, the proposed purchase price is $515,-000, and the aggregate amount of the liens is $426,201. The IRS and trust holders are

fully secured, and they will be adequately protected when their liens attach to the sale proceeds. *See Collins,* 180 B.R. at 452. Accordingly, with respect to the tax liens held by the IRS, the sale is permissible under § 363(f)(3).

■ As for DMAS's right of recapture, we observe that the proposed sale fails to satisfy the condition specified in subsection (f)(1), for applicable non-bankruptcy law, namely Va.Code § 32.1–329, does not permit a sale free and clear of DMAS's interest if the debtor fails to reimburse DMAS for the recaptured depreciation. The proposed sale also fails to satisfy subsections (f)(2) and (f)(3), since DMAS has not consented to the sale, and DMAS has asserted that its interest is not a lien. Additionally, DMAS's interest is not the subject of a bona fide dispute. In this instance, the debtor recognizes DMAS's interest, and is thus seeking an injunction to prevent its enforcement. Because there is no bona fide dispute concerning the extent or validity of DMAS's interest, subsection (f)(4) is unsatisfied.

■ The only remaining subsection is (f)(5), which permits a sale free and clear of any interest when "such entity [holding the interest] could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5). At the outset, it should be emphasized that § 363(f)(5) specifies a *money* satisfaction, which suggests that the interest must be reducible to a claim. The Bankruptcy Code defines "claim" as a "right to payment"—something that can be satisfied with money. *Id.* § 101(5); *see also In re Beker Indus. Corp.,* 63 B.R. 474, 478 (Bankr. S.D.N.Y.1986) (stating that "§ 363(f)(5) is to be interpreted ... as referring to those few interests in property that can, by operation of law, be reduced to dollars."). Accordingly, if a holder of an interest cannot be compelled to accept a cash award in lieu of equitable relief, the sale cannot proceed under § 363(f)(5).

To illustrate, suppose the interest in question is a restrictive covenant running with the land. Assume further that the debtor is violating the restrictive covenant, which prompts the adjacent landowners to seek a remedy, such as money damages. In this example, however, money damages would not be an adequate remedy because the debtor could conceivably pay the damages and continue violating the covenant, which would force the landowners to commence another lawsuit for subsequent violations. An adequate remedy available to the landowners would be prospective relief, namely an injunction that enforces the covenant as an equitable servitude. In this situation, there is nothing that can force the landowners to "forego equitable relief in favor of a cash award." *Gouveia v. Tazbir,* 37 F.3d 295, 299 (7th Cir.1994). For this reason, § 365(f)(5) would not permit a bankruptcy trustee to sell the land free of the restrictive covenant. *Cf. Gouveia,* 37 F.3d at 299–300 (concluding that the trustee could not sell the land free and clear of the covenant); *In re 523 E. Fifth Street Hous. Preserv. Dev't Fund Corp.,* 79 B.R. 568, 576 (Bankr.S.D.N.Y.1987) (holding that the property could not be sold free of the restrictive covenant).

■ True, some injunctions, or rather some rights protected by injunctions, are reducible to claims inasmuch as the term "claim" under the Bankruptcy Code encompasses a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(5)(B). In *Torwico Electronics, Inc. v. State of New Jersey, Department of Environmental Protection,* 8 F.3d 146 (3d Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1576, 128 L.Ed.2d 219 (1994), the Court of Appeals for the Third Circuit discussed the extent to which an environmental cleanup order constituted a "claim" in bankruptcy. Although *Torwico* did not address § 363(f)(5) directly, the decision is still instructive here. In that case, following the intervention of bankruptcy, a state agency issued a cleanup order requiring the debtor to remove hazardous wastes that were located on land formerly owned by the debtor. The debtor argued that the cleanup order was a claim avoidable through the bankruptcy process. The court of appeals disagreed, concluding that the cleanup order was a "regulatory obligation," not a bankruptcy claim, to the extent it required the debtor to ameliorate ongoing pol-

lution. *Id.* at 150. In effect, the cleanup order could not be reduced to a claim because "there is no option to accept payment in lieu of continued pollution." *Id.* at 149 (quoting *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1008 (2d Cir.1991)). The court did explain, however, that a cleanup order would present a claim to the extent the government could have cleaned the site, and then sought reimbursement. *Id.* at 150; *see also Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985) (holding that state's right to collect from debtor in order to defray cost of cleanup was a "claim" in bankruptcy).

We conclude, for the following reasons, that DMAS's right of recapture is not akin to the restrictive covenant set forth in the illustration above. Nor is it similar to the cleanup order addressed in *Torwico, supra.* Unlike the situations involving the restrictive covenant and the cleanup order, DMAS is not confronted with an ongoing violation of its interest. Nor is there the threat of an ongoing nuisance that confronted the court in *Torwico.* If the sale goes forward, DMAS's right of recapture will arise through a one-time transaction. In exercising this right, DMAS would collect a payment—either from the debtor or from the transferee, Gilron, Inc. The only threat confronting DMAS is the loss of money that would result from selling the assets free and clear of DMAS's interest. Accordingly, we conclude that DMAS's interest can be reduced to a claim, and is therefore subject to a hypothetical money satisfaction under 11 U.S.C. § 363(f)(5).

We emphasize "hypothetical" satisfaction, since § 363(f)(5) authorizes a sale if the interest holder *"could be* compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." *Id.* (emphasis added). The courts are divided, nevertheless, as to whether the statute requires a hypothetical payment that could fully satisfy the underlying debt. *Compare, e.g., In re Healthco Int'l, Inc.*, 174 B.R. 174, 176 (Bankr.D.Mass.1994) (holding that the terms

"money satisfaction" mean "a payment constituting less than full payment of the underlying debt"), *with Richardson v. Pitt County (In re Stroud Wholesale, Inc.)*, 47 B.R. 999, 1003 (E.D.N.C.1985) (holding that the terms "money satisfaction" mean "full satisfaction of creditors' interests" in liquidation sales), *aff'd per curiam*, 983 F.2d 1057 (4th Cir. 1986) (unpublished disposition).[10] However, the case at hand presents a situation that is different from both *Healthco* and *Stroud Wholesale*, since the interests involved in those cases were liens. Compared with unsecured claims, the Bankruptcy Code provides greater protection to claims secured by liens. For example, creditors are entitled to adequate protection and the indubitable equivalent of their secured claims. *See* 11 U.S.C. §§ 361, 1129(b)(2)(A)(iii). Accordingly, the debate concerning full payment is more relevant to liens. Because the right of recapture is neither a lien nor a right of setoff against the debtor, DMAS has at best an unsecured claim against the debtor. In a hypothetical equitable proceeding, such as a "cram down" of a Chapter 11 plan, DMAS could be compelled to accept less than full payment on its underlying unsecured claim. *See Healthco*, 174 B.R. at 176–77. Thus, with respect to DMAS's interest, the proposed sale satisfies § 363(f)(5). The objections of DMAS and the IRS are therefore overruled, and the sale proposed by the debtor is approved.

### III.

■ Having determined that the proposed sale satisfies 11 U.S.C. § 363(f), we turn next to the constitutional question of whether the foregoing bankruptcy statute preempts Va.Code § 32.1–329, the state statute granting the right of recapture to DMAS. The Supreme Court of the United States has held that a statute enacted by Congress may displace state law in the following three ways:

First, in enacting the federal law, Congress may explicitly define the extent to which it intends to pre-empt state law. Second, even in the absence of express

---

10. As indicated, the Court of Appeals for the Fourth Circuit affirmed *Stroud Wholesale* through an unpublished opinion, which is non-

binding precedent. *See Quesinberry v. Life Ins. Co.*, 987 F.2d 1017, 1029 n. 9 (4th Cir.1993) (en banc).

pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Michigan Canners & Freezers Ass'n, Inc. v. Agricultural Mktg. & Bargaining Bd.*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984) (citations and internal quotation marks omitted). Our analysis concentrates on the last basis for preemption, *viz.*, whether Va.Code § 32.1–329 actually conflicts with the 11 U.S.C. § 363(f) by "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Although DMAS suggests that we should evaluate only the broader "purposes and objectives of Congress" in enacting the Bankruptcy Code, we believe that our analysis must begin with the plain language of the relevant bankruptcy statute, § 363(f). *See Michigan Canners*, 467 U.S. at 470, 104 S.Ct. at 2523–24; *see also* Laurence H. Tribe, *American Constitutional Law* § 6–25, at 480 (2d ed. 1988) ("[T]he question whether federal law in fact preempts state action in any given case necessarily remains largely a matter of statutory construction.").

The plain terms of § 363(f) provide that a trustee or debtor-in-possession may sell estate property "free and clear of any interest in such property...." The Virginia statute mandates the opposite result: if estate property is sold, and the debtor is unable to reimburse DMAS for the recaptured depreciation, DMAS may collect from the buyer, using "any means available by law...." Va. Code § 32.1–329(C). In this respect, the Virginia statute creates an interest or charge on the property, even though the federal statute, § 363(f), authorizes the property to be sold free and clear of such interests. The Virginia statute thus interferes with the federal statute, and accordingly, the federal statute must prevail. *See* U.S. Const. art. VI, cl. 2.

This same conclusion holds if we look beyond the statutory language, toward the broader "purposes and objectives" intended by Congress. Although the parties have not cited any legislative history describing the basis underlying the "free-and-clear" provision of § 363(f), it stands to reason that the purpose behind the "free-and-clear" language is to maximize the value of the asset, and thus enhance the payout made to creditors. Without the "free-and-clear" language, prospective buyers would be unwilling to pay a fair price for the property subject to sale; instead, the price would have to be discounted, perhaps quite substantially, to account for the liabilities that the buyer would face simply as a result of acquiring the asset. *See All American of Ashburn, Inc.*, 56 B.R. at 190; *Forde v. Kee–Lox Mfg. Co.*, 437 F.Supp. 631, 633–34 (W.D.N.Y.1977), *aff'd on other grounds*, 584 F.2d 4 (2d Cir.1978). A discounted price would reduce the return to the estate to the detriment of the creditors involved in the case. The "free-and-clear" language avoids this kind of prejudice by providing the buyer with what is essentially a fully marketable title.

Section 32.1–329 of the Virginia Code contravenes the "free-and-clear" language by creating a statutory form of successor liability. Such a provision is sensible outside bankruptcy because it allows DMAS to provide depreciation reimbursements based on the nominal, historical price paid for the asset. *See Hoodkroft Convalescent Ctr.*, 879 F.2d at 973–74. Inside bankruptcy, however, DMAS must contend with the interests of other creditors who would be prejudiced by the effect of the Virginia statute. It is undisputed that the buyer, Gilron, Inc., will not complete the sale if DMAS is allowed to exercise its right of recapture. If the sale is not consummated, the debtor will be left with two options. Initially, it could try to arrange another sale at a discounted price. Alternatively, it could permit the lienholders to sell the assets at foreclosure, at a price so distressed that DMAS's right of recapture would not be invoked. Either option would

injure the other creditors—a result that the "free-and-clear" language is designed to avoid.

Comparing the broad purposes of the Bankruptcy Code with the Medicaid scheme, DMAS argues that no conflict exists. In support of its position, DMAS relies on *In re Borne Chemical Company*, 54 B.R. 126 (Bankr.D.N.J.1984), a case that dealt with the effect of bankruptcy on environmental cleanup obligations. *Borne* involved a state statute that required landowners, on the eve of selling their land, to certify to a state agency that no pollution existed on the property, or if there was pollution on the property, to file a cleanup plan and post a bond securing performance under the plan. If the landowner failed to comply with the statute, the state agency could void the sale. In conjunction with a sale under § 363, the debtor in *Borne* sought a court declaration that it was not required to comply with the state environmental statute because the Bankruptcy Code preempted it. The court in *Borne* disagreed, finding that the state statute did not interfere with the purposes underlying the Bankruptcy Code. The court explained that the purpose behind the Bankruptcy Code was to "provide for an equitable, orderly and expeditious distribution of the assets of the estate," *id.* at 131, and it found that the state statute did not interfere with this objective even if, as a result of compliance with the state statute, the creditors would receive a smaller dividend on their claims. *See id.* at 132.

 Relying on *Borne Chemical,* DMAS contends that its rights against the buyer will not interfere with the "equitable, orderly and expeditious distribution of the assets of the estate." Consequently, section 32.1–329 of the Virginia Code does not interfere with the broad purposes and objectives of the Bankruptcy Code. The problem with DMAS's analysis, however, is that it ignores the "free-and-clear" language contained in the 11 U.S.C. § 363. Although preemption is ultimately a constitutional question, the starting point for discerning the "purposes and objectives of Congress" is the plain language of

the federal statute itself. *See Michigan Canners & Freezers Ass'n,* 467 U.S. at 469–70, 104 S.Ct. at 2523; *Securities Indus. Ass'n. v. Connolly,* 883 F.2d 1114, 1118 (1st Cir.1989), *cert. denied,* 495 U.S. 956, 110 S.Ct. 2559, 109 L.Ed.2d 742 (1990). The proper focus then is on the "free-and-clear" language—the very language that Va.Code § 32.1–329 interferes with, as previously noted. To the extent that the *Borne* decision suggests otherwise, we find it unpersuasive.

DMAS emphasizes that it will suffer a financial burden if the Court enjoins it from proceeding against the buyer, Gilron, Inc. If it fails to recover the recaptured depreciation, DMAS asserts that it still will have to reimburse the federal government for the latter's share of the "recaptured" depreciation. It will also have to pay to Gilron "a depreciation amount equal to the amount of depreciation previously allowed to the [d]ebtor but not reimbursed, fully or in part, by the debtor." [11] Although we recognize the difficult situation presented here, DMAS's argument still cannot overcome the plain terms of § 363(f), which permit the debtor to sell its assets "free and clear" of liens and other interests. Inasmuch as the barrier confronting DMAS is the "free-and-clear" language of § 363(f), DMAS's remedy is with Congress, not the courts.

DMAS contends that a decision favoring the debtor will encourage other nursing homes to use bankruptcy as a vehicle for avoiding their obligations under Va.Code § 32.1–329. Conversely, prospective buyers of nursing-home assets would be encouraged to require sellers to file for bankruptcy as a condition of sale. DMAS points out that, under the so-called "Boren Amendment," the Commonwealth of Virginia must provide "assurances satisfactory" to the U.S. Secretary of Health and Human Services that the costs it reimburses are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities. . . ." 42 U.S.C. § 1396a(a)(13)(A). If other nursing homes file for bankruptcy in order to cleanse their assets of DMAS's recapture rights, the Commonwealth of Virgi-

---

11. Reply Memorandum of Law of the Virginia Department of Medical Assistance Services in

Opposition to the Debtor's Motion to Sell Assets Free and Clear of Liens, at 6.

nia will be unable to make such "assurances" to the federal government, and will thus confront the risk of losing all Medicaid funding.

The problem with DMAS's argument is that it suffers from the fallacy common to other slippery-slope arguments—that bankruptcy courts will be unable to distinguish future nursing-home cases from the one at hand, based on the unique facts presented in each case. In addition, DMAS has other means at its disposal to combat a large onslaught of nursing-home bankruptcies, if they arise. DMAS may challenge whether each proposed sale satisfies the elements of 11 U.S.C. § 363, as it has done in this case, or it may move to dismiss a bankruptcy petition for want of good faith. *See Carolin Corp. v. Miller,* 886 F.2d 693, 700–02 (4th Cir.1989).[12] For these reasons, we are unpersuaded that a decision favoring the debtor will necessarily translate into a free ticket for those who want to avoid the obligations imposed by Va.Code § 32.1–329.

■■ Section 105(a) of the Bankruptcy Code provides, in relevant part, that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). This provision "simply authorizes a bankruptcy court to fashion such orders as are necessary to further the purposes of the substantive provisions of the Bankruptcy Code." *United States v. Sutton,* 786 F.2d 1305, 1307 (5th Cir.1986). It therefore "authorizes bankruptcy courts to issue injunctions and take other necessary steps in aid of their jurisdiction." *Id.* (footnote omitted). DMAS asserts that the debtor's complaint improperly relies on the equitable powers available under § 105(a). Specifically, DMAS contends that, although § 105(a) authorizes a bankruptcy court to exercise broad equitable powers, it does not, in and of itself, create substantive rights that the debtor can enforce through a permanent injunction.

■■ We agree that § 105(a) neither creates substantive rights nor permits the

courts to contravene the Bankruptcy Code. But here, our decision to award injunctive relief is based on the "free-and-clear" language of 11 U.S.C. § 363(f) and on the Supremacy Clause of the United States Constitution. The debtor's complaint cites, in addition to § 105(a), § 363 as the basis for relief, *see* Complaint ¶ 1, and we conclude that the complaint alleges a colorable claim for invoking permanent injunctive relief. Having determined that Va.Code § 32.1–329 conflicts with the "free-and-clear" language of 11 U.S.C. § 363(f), and having further determined that a permanent injunction is necessary to "carry out" the effect of the "free-and-clear" language and to allow the debtor to proceed to plan confirmation, we will issue an order permanently enjoining DMAS from exercising its right of recapture against the buyer, Gilron, Inc.

## IV.

For the foregoing reasons, we overrule the objections of DMAS and the IRS, and accordingly approve the sale proposed by the debtor. We also deny DMAS's request for summary judgment, or in the alternative, for dismissal of the adversary proceeding under Fed.R.Civ.P. 12(b)(6). Concluding that the relevant bankruptcy statute, 11 U.S.C. § 363(f), preempts Va.Code § 32.1–329, we permanently enjoin DMAS from exercising its rights against Gilron, Inc. An appropriate order will be entered, permanently enjoining DMAS from pursuing its rights under Va.Code § 32.1–329. As for the sale itself, this matter is continued to the 17th day of October, 1995, at 9:30 a.m., for presentation by counsel for the debtor of a proposed order approving the sale, and overruling the objections of DMAS and the IRS.

### ORDER

For the reasons set forth in the Memorandum Opinion dated the 3rd day of October, 1995, and entered herein, the Court makes the following findings and conclusions:

(1) The Virginia Department of Medical Assistance Services ("DMAS") is the state

---

**12.** The foregoing assumes, of course, that any challenge to a bankruptcy petition or to a proposed sale will not be frivolous, and it will not be interposed to serve an improper purpose. *See* Fed.R.Bankr.P. 9011(a).

agency that administers the federal Medicaid program in the Commonwealth of Virginia. Under the Medicaid scheme, the federal government provides money to states which, in turn, enables them to fund medical treatment for the poor. To receive Medicaid funding, a state must submit a plan for medical assistance to the U.S. Secretary of Health and Human Services for approval. Such plans establish a scheme for reimbursing nursing homes and other health care providers for the costs of treating Medicaid-qualified patients. Among the costs reimbursable under Virginia's plan is the depreciation of a nursing home's tangible assets.

(2) Section 32.1–329 of the Virginia Code provides DMAS with a mechanism for recovering or "recapturing" at least a portion of the depreciation reimbursement it has previously paid to a nursing home. If a nursing home decides to sell a depreciated asset, Va.Code § 32.1–329 authorizes DMAS to recapture the depreciation it paid to the extent that a gain is realized from the sale (*i.e.*, to the extent the purchase price exceeds the asset's depreciated cost basis).

(3) The failure of the seller to reimburse DMAS for the recaptured depreciation renders the sale "ineffective" as to the Commonwealth of Virginia. Va.Code § 32.1–329(C). DMAS may then collect the recaptured depreciation, using "any means available by law," which includes a setoff against the Medicaid reimbursement that would be owed to the buyer, as the new owner of the nursing home. *Id.*

(4) The instant dispute involves the sale of a nursing home. For nearly 20 years, the debtor, WBQ Partnership, has operated a nursing home located in Stafford, Virginia, and it has received, as its principal source of income, Medicaid reimbursements from DMAS. The debtor's nursing home facility is situated on real property owned by Michael and Sherill Quigley, and William and Shirley Bagley. The debtor itself is a partnership comprising of Michael Quigley and William Bagley, and it owns the personal property connected with the nursing home.

(5) On February 11, 1993, the debtor filed a petition under Chapter 11 of the Bankruptcy Code. Because the debtor's income has declined postpetition, the debtor has determined that it cannot reorganize, and has thus decided to liquidate under Chapter 11 by selling nearly all its assets to a single buyer.

(6) The debtor has entered into an Asset Purchase Agreement and a First Amendment to the Asset Purchase Agreement (collectively, the "Purchase Agreement") with Gilron, Inc., the prospective buyer. A principal of Gilron is Ronald Bailey, the current manager of the debtor's nursing-home facility. The Purchase Agreement provides that Gilron will buy the real property owned by the Quigleys and the Bagleys, and nearly all the personal property owned by the debtor. The debtor has asked the Court to approve the Purchase Agreement under 11 U.S.C. § 363(f), which allows a trustee or debtor-in-possession to sell estate property free and clear of any interest.

(7) The parties to the Purchase Agreement have agreed that the purchase price will be the lesser of (a) $700,000, or (b) the total amount of depreciation that will be allowed to Gilron. DMAS has determined that the total allowed depreciation will be $515,-000. The purchase price is therefore $515,-000, and the total amount of depreciation that DMAS intends to recapture from the sale is $196,000.

(8) DMAS concedes that its right of recapture under Va.Code § 32.1–329 is not a lien. Because liens already encumber a large share of the assets that are subject to the sale, it is highly unlikely that DMAS will recapture the entire sum of $196,000 from the debtor's bankruptcy estate. Gilron asserts, and DMAS concedes, that should DMAS offset the recaptured depreciation against the Medicaid payments owed to Gilron, Gilron would lose the level of income necessary to operate the nursing home efficiently and economically. Consequently, Gilron will not complete the sale if DMAS is allowed to exercise its recapture rights against Gilron.

(9) The debtor asserts, without dispute, that there will be no hope of presenting a confirmable plan if the sale does not go forward. Without a confirmable plan, the debtor will be forced to dismiss its bankruptcy

case or liquidate under Chapter 7. Either outcome would allow the lienholders to sell the assets at foreclosure, probably at a price so distressed that DMAS's right of recapture will not be invoked. In addition, closing the nursing home would impose a significant burden on the patients and their families, for the closest nursing home is twenty miles away, and it has no available beds to accommodate the patients released from the debtor's facility.

(10) The debtor has commenced this adversary proceeding, asking the Court to enjoin DMAS in conjunction with approving the Purchase Agreement. In response, DMAS has moved for summary judgment, or in the alternative, to dismiss the debtor's complaint for injunctive relief on grounds that it fails to allege a colorable claim.

(11) The Purchase Agreement satisfies the requirements of 11 U.S.C. § 363(f). The debtor's motion to sell the assets free and clear of interests, including DMAS's right of recapture, is therefore granted.

(12) The plain terms of 11 U.S.C. § 363(f) provide that a trustee or debtor-in-possession may sell estate property "free and clear of any interest in such property...." Section 32.1–329 of the Virginia Code mandates the opposite result: if estate property is sold, and the debtor is unable to reimburse DMAS for the recaptured depreciation, DMAS may collect it, using "any means available by law," which includes an action for attachment or levy, and a setoff against the Medicaid reimbursements owed to the buyer. Va.Code § 32.1–329(C) & (D). In this respect, the Virginia statute creates an interest or charge on the property, even though the federal statute, § 363(f), authorizes the property to be sold free and clear of such interests. The Virginia statute thus interferes with the federal statute, and accordingly, the federal statute, 11 U.S.C. § 363(f), must prevail. *See* U.S. Const. art. VI, cl. 2.

Based on the foregoing, IT IS

ORDERED that the Motion by the Virginia Department of Medical Assistance Services to Dismiss Complaint or in the Alternative, for Summary Judgment in its Favor be, and it hereby is, DENIED. It is further

ORDERED that the request of the debtor, WBQ Partnership, for injunctive relief be, and it hereby is, GRANTED insofar as the defendant, DMAS, is permanently enjoined from exercising its rights under Va.Code § 32.1–329 as follows:

(a) As a result of the sale set forth in the Purchase Agreement, DMAS is barred from seeking or receiving any recapture, reimbursement, or recovery of depreciation (i) directly from the assets that are subject to the Purchase Agreement, or (ii) from the purchaser, Gilron, Inc. DMAS is further barred from offsetting any recapture of depreciation against the Medicaid reimbursements owed to Gilron, Inc.

(b) Except for reasons unrelated to this proceeding, DMAS is barred from retaliating against the purchaser, Gilron, Inc., by refusing to license the nursing-home facility that is the subject of the debtor's sale, or by attempting to exclude Gilron, Inc. from participating in the Medicaid program.

(c) Notwithstanding the foregoing, this order does not preclude DMAS from exercising any rights that it may have under the Bankruptcy Code or under the Federal Rules of Bankruptcy Procedure to obtain payment on its claim from either the debtor or the debtor's bankruptcy estate.

This matter is continued to the 17th day of October, 1995, at 9:30 a.m., for presentation by counsel for the debtor of a proposed order approving the sale, and overruling the objections of DMAS and the IRS.

The Clerk shall transmit via first-class mail a copy of this order to the attorneys included on the attached circulation list.