### In re MEDICAL SOFTWARE SOLUTIONS d/b/a/ PerfectPractice, MD, Debtor.

#### No. 02–32330.

United States Bankruptcy Court, D. Utah.

Nov. 14, 2002.

---

9. 11 U.S.C. § 1325(a)(4).

David E. Leta and Matthew Boley, Snell & Wilmer, Salt Lake City, Utah, for the Debtor.

Noel Hyde, Ogden, Utah, for the Individual Shareholders.

Mary Anne Wood, Wood Crapo LLC, Salt Lake City, Utah, for Amy Lewis.

Julia Pettit and Danny Kelly, Stoel Rives LLP, Salt Lake City, Utah, for Dominion Fund V, L.P.

Tobias Keller, Pachulski, Stang, Ziehl, Young & Jones, P.C., San Francisco, California, for Dominion Fund V, L.P.

Alan Walsh and Joel Marker, McKay, Burton & Thurman, Salt Lake City, Utah, for the Examiner, D. Ray Strong.

Weston L. Harris, Parsons Davies Kinghorn & Peters, P.C., Salt Lake City, Utah, for Dominion Venture Finance, LLC.

Laurie Cayton, United States Trustee's Office, Salt Lake City, Utah, for the Trustee.

## MEMORANDUM DECISION

WILLIAM T. THURMAN, Bankruptcy Judge.

The issue before the Court is whether the Debtor's proposed sale of substantially all of its assets outside the ordinary course of business, and before a Chapter 11 Plan of Reorganization and Disclosure Statement have been proposed, should be approved by the Court. Complicating matters further, the proposed buyers are insiders as that term is defined within the Bankruptcy Code. Arguments and evidence were presented to the Court in a lengthy hearing held September 26, 2002 (the "September 26 Hearing") and the Court orally issued its findings of fact and conclusions of law into the record from the bench on September 27, 2002 wherein the Court granted the sale motion. An order was entered approving the sale that same day. In addition, the Court indicated it would supplement its decision with a written opinion and this Memorandum Decision follows.

## I. INTRODUCTION

The issue before the Court arises in the context of Medical Software Solution's (the "Debtor") motion to sell essentially all of its assets to the Dominion Fund V parties (Dominion Fund V, Windward Ventures 2000 and Windward Ventures 2000–A; collectively known hereinafter as the "DF Lenders"). The Debtor seeks to sell its assets free and clear of all liens, encumbrances and interests, except for assumed liabilities, under 11 U.S.C. §§ 363(b) and (f)[1]. The Debtor's assets include real property leases, equipment leases, licenses, permits, inventory, proprietary assets, general intangibles, assumed contracts, cash, accounts receivable, and other identified personal property. The asset sales contract (the "Purchase Agreement") negotiated between the DF Lenders and the Debtor specifically excludes the sale of claims relating to Chapter 5 of the Bankruptcy Code and other specified claims. Interestingly, and importantly, as part of the Purchase Agreement, the Debtor required the DF Lenders to assume certain liabilities including: liabilities arising out of the assets' ownership and business operation, the real property leases, the assumed contracts with customers and equipment leases, liabilities under certain permits, and certain other liabilities. The Purchase Agreement also excluded certain enumerated liabilities. Specifically excluded was any liability that the Debtor may have to Amy Lewis, the Debtor's former CEO.

## II. FACTS

The facts of this case are in nowise straightforward. While some facts have been abbreviated, most of the given information is essential to the Court's decision.

The Debtor's history has been a story of hopes and dreams of success, without significant financial achievement. The Debtor was formed by Ms. Amy Lewis and her former husband, among others, to develop and implement software tools to assist physicians in managing the medical billing process. This endeavor not only grew in scope and customer base, but also in financial needs beyond the founders' capacity to finance expansion. As a result, the Debtor began to look for alternative sources of capital. Recognizing the market potential of medical billing software and finding the opportunity attractive, the DF Lenders invested venture capital in the Debtor.

The Debtor partially funded its cash flow needs by selling its software products to customers. More significantly, however, beginning in 1999, cash flow needs were funded by several cash infusions from the DF Lenders. To illustrate the effect of the cash infusions on the Debtor's financial position, the DF Lenders produced a graph showing the Debtor's cash levels over the last several years in relation to the corresponding cash infusions from the DF Lenders. The cash levels spiked with infusions solely from the DF Lenders. These infusions occurred in January 2000 with the Series A stock for cash transaction, again in September 2000 with the Series B stock transaction and in July 2001 with the Series B–1 stock transaction. Through these collective stock-for-cash transactions, the DF Lenders negotiated a 60% ownership in the company and placed two representatives, Renee Masi and Michael Kevin Lee, on the Debtor's board of directors. The cash infusions, however, were insufficient to make the Debtor profitable.

In October, 2001, the Debtor sought additional financing from the DF Lenders. Even though the Debtor had the option of

**1.** All further references to the United States Code are to Title 11 unless otherwise noted.

additional financing through stock issuance under the previous stock-for-cash agreement, the Debtor negotiated a $2,500,000 loan (the "Bridge Loan") from the DF Lenders. The Bridge Loan is secured by essentially all the Debtor's assets.[2] Despite the cash infusion from the Bridge Loan, the Debtor continued to experience staggering losses. In fact, the Debtor's year-to-date losses on July 25, 2002 were $2,247,379.

Throughout the unprofitable years, and at the occurrence of each financing agreement with the DF Lenders, the Debtor's CEO was Amy Lewis. She participated in negotiations with the DF Lenders, and she was a member of the Debtor's board of directors. She actively participated in decisions to finance the company through the DF Lenders' equity investments and helped negotiate the Bridge Loan. Amy Lewis is also a shareholder in the company.

A management dispute arose in the beginning of 2002, and the board of directors terminated Ms. Lewis from her CEO position with the company. Members of the Debtor's board of directors, in early 2002, consisted of Mr. Lee and Ms. Masi, as representatives of the DF Lenders; Ms. Lewis; Mr. Rick Altinger, an employee of the debtor; and Timothy Layton, a consultant to the company. Mr. Altinger and Mr. Layton were not affiliated with the DF Lenders. After her termination, Amy Lewis commenced a lawsuit against the debtor and others, including the DF Lenders, alleging *inter alia* improper employment termination, sexual harassment and gender discrimination, retaliation, breach of contract and defamation. That litigation is pending elsewhere. She remained a member of the board, however, and the DF Lenders continued to fund the Debtor. The Debtor's total debt from the Bridge Loan, at the time of the bankruptcy petition, was approximately $3,200,000.

The mounting losses within the company and the changes in leadership were beginning to have additional consequences. At the time of the bankruptcy filing, the board consisted of Mr. Lee, Ms. Massey, Ms. Lewis and Mr. Altinger. Mr. Layton resigned from the board of directors citing stress. Mr. Altinger continued to be a consultant to the Debtor and Ms. Lewis is now a consultant for a company identified as OfficeRX. OfficeRX conducts a business similar to the Debtor. OfficeRX also has an escrow agreement with the Debtor whereby should the debtor default on its support obligations to its customers, i.e. the medical offices, OfficeRX has a non-exclusive right to acquire the source code to the Debtor's software free of charge.[3] As problems within the Debtor mounted, losses continued and the board of directors vigorously pursued a sale of the company.

In addition to pursuing a sale just prior to the bankruptcy petition, the Debtor has sought to market the company throughout the preceding year. In September 2001, the Debtor engaged the services of an investment banker, Thomas Weisel Partners ("TWP") to aid in the marketing effort. TWP was selected after the Debtor considered numerous other bankers. TWP compiled a list, updated regularly

---

**2.** The loan is termed a "Bridge Loan" because the loan conditions provided that the security interest granted to the DF Lenders in consideration for the loan would convert to equity upon the occurrence of either another round of financing or upon the sale of the company.

**3.** The exact nature of the OfficeRX product was not presented as evidence, however, it is sufficient for the court to note that OfficeRX has a distinct pecuniary interest in the Debtor's success and failure, which clouds Ms. Lewis's motives in this entire matter.

with the input of the board, containing the names of all potential interested purchasers. TWP maintained an ongoing log of its sales activities, and of the contacts made with potential purchasers. TWP or Mr. Altinger made weekly reports to the board of directors through January or February 2002 regarding the marketing efforts. Unfortunately, the marketing efforts did not produce any legitimate interest in the Debtor. Mr. Altinger testified that the Debtor conducted some discussions with possible suitors, but received no firm offer, term sheet, deposit or earnest money, and that no efforts were made to close a sale because no offer had been made or received. The Debtor terminated its relationship with TWP in April or May 2002. Mr. Altinger continued to solicit possible buyers afterwards. Evidence at the September 26 Hearing showed diligent efforts on the part of Mr. Altinger to continue to find a buyer throughout August and September 2002.

With no white knight to rescue the company in the foreseeable future, the Debtor elected to file for relief under Chapter 11 of the Bankruptcy Code on July 26, 2002. On Aug. 5, 2002, this Court entered an order directing the appointment of an Examiner.[4] The Debtor sought the unusual relief of an Examiner's appointment to preempt the anticipated allegations of bias against the current board, and of bias regarding a possible sale to the DF Lenders in exchange for cancellation of their secured claims. Pursuant to that request, the Court required the Examiner's appointment to investigate certain aspects of any offer. As part of its mandate, the Court specifically directed the Examiner to investigate the propriety of any sale to the DF Lenders. The United States Trustee's Office appointed Mr. D. Ray Strong as the Examiner, and he has functioned in that capacity since his appointment. The Examiner has filed two reports. The first report was an analysis of the Debtor's request to obtain debtor in possession ("DIP") financing from the DF Lenders, and the second, a report in response to the proposed sale.

The Court considered the Examiner's first report in conjunction with a hearing to consider the Debtor's request for post-petition financing. Although the funding came from an admitted insider,[5] it appeared to be appropriate and to be the only means upon which the Debtor could continue operating. The DIP financing motion was approved, and the DF Lenders advanced an additional $500,000 to the Debtor post-petition. Without a buyer for the company, however, the Debtor's assets would likely be liquidated and the Debtor would cease doing business. The terms of the DIP financing require a sale of the company to close on or before September 30, 2002. Failure to close a sale by that date constitutes a default event under the terms of the DIP loan.

The Debtor filed a motion to approve a sale of substantially all of its assets to the DF Lenders on August 22, 2002. The salient portions of the Purchase Agreement are: (1) cancellation of approximately $3,200,000 representing the Buyers' secured pre-petition indebted-

---

**4.** The Debtor initially filed the Motion to Appoint an Examiner which was heard by the Court at a hearing held August 1, 2002. The Court expressed reservations about the Debtor's standing to make such a motion under § 1104(c) and, subsequently, the United States Trustee joined in the motion.

**5.** Section 101(31)(B) states that an insider includes a "(i) director of the debtor" and a "(iii) person in control of the debtor." All parties agree that the DF Lenders meet this definition because two members of the Debtor's board of directors are affiliated with the DF Lenders.

ness; (2) cancellation of approximately $500,000, representing the Debtor's post-petition indebtedness to the Buyers approved by the DIP loan; (3) $100,000 in cash for unsecured creditors; (4) additional cash of approximately $22,000 as needed to cure pre-existing liens; (5) additional cash of approximately $85,000 for Chapter 11 administration expenses; (6) assumption of all contracts and agreements especially with its customers, totaling approximately $1,100,000; (7) release of all claims between the Debtor and the buyers—excluding the claim of Amy Lewis and any rights and remedies with respect to her claim; (8) subject to higher and better bids. The agreement also proposed an auction be held on September 23, 2002 should any qualified bids be obtained. No other qualified bids were made, except that of OfficeRX as discussed *infra*.

The Examiner conducted an investigation of the proposed sale to the DF Lenders, including the terms of the Purchase Agreement, and he filed his second report on September 26. The Examiner was sworn as a witness in this matter in the September 26 Hearing regarding the Motion to Approve the Sale, and his report was received into evidence. In his report, the Examiner indicated that he conducted a fair and comprehensive analysis of the Debtor's history, including: its past and current financial condition; the Purchase Agreement between the Debtor and the DF Lenders; the objections submitted by the shareholders and by Amy Lewis; an analysis of the insider allegations and affiliations of the parties and their representatives; an analysis of other financing possibilities, i.e., venture capital markets and traditional lending; an analysis of the funding from the DF Lenders; TWP's involvement and attempts to sell the company; Amy Lewis's position and her termination in March 2002; and an analysis of

possible additional bridge loans from the DF Lenders in 2002 and the proposed sale to the DF Lenders.

The Examiner also reported on the efforts to sell the company to other proposed suitors. In particular, he examined one offer from OfficeRX for $200,000 for a non-exclusive license to the source code. The Debtor rejected OfficeRX's offer because it was not a qualified bid under the terms previously established by the Court in its September 9, 2002 Order Approving (A) Bidding Procedures and Protections, and (B) Form and Manner of Notice of Auction and Sale Hearing ("September 9, 2002 Order"). The Examiner found no other evidence of qualified buyers. He also concluded, as part of his analysis of the possibility of competing bids, that he doubted the outcome would be different if the solicitation period was extended.

The Examiner also examined whether the sale was proposed in good faith. Objections to the sale from both Ms. Lewis and the shareholders allege, among other things, bad faith on the part of the DF Lenders. The Examiner investigated and reported on a number of these bad faith allegations made by the objectors. The Examiner found no evidence to suggest that the DF Lenders acted in bad faith regarding the October 2001 Bridge Loan. The examiner also concluded that there was no evidence to suggest bad faith in the Debtor's efforts to market the company or in negotiating the Asset Purchase Agreement with the DF Lenders.

Finally, the Examiner also investigated issues regarding the sale unraised by either party. The Examiner expressed concern that the sale will result in a waiver of claims that may exist between the Debtor and the DF Lenders, although, no evaluation was made as to whether any exist between them. He also pointed out that in

his estimation, the release language relating to claims in the Purchase Agreement is vague and ambiguous.

Ultimately, however, in evaluating the sale as a whole, the Examiner concluded the sale should go forward. The Examiner concluded that the offer from the DF Lenders as set forth in the Purchase Agreement is the highest and best offer received, and that due to the tenuous nature of the Debtor's financial condition, any delay in sale consummation may adversely affect the Debtor's ability to continue as a going concern. In addition, the Examiner testified that the tarnish of bankruptcy might adversely affect the Debtor's ability to obtain new customers and retain existing customers and employees. The Examiner testified that he is not aware of any other alternative proposals for additional DIP financing to allow continued operations past September 30, 2002—the deadline negotiated by the DF Lenders and the Debtor, as part of the DIP financing arrangement, that a sale must close or the Debtor would default on its obligations. This financing arrangement was previously approved by the Court. Significantly, the Examiner stated that any delay in the asset sale might jeopardize the continuing operations as a going concern, resulting in deterioration of the Debtor's assets and adversely affect its creditors.

During the course of the hearing, Mr. Kendell Cooper was called as a witness by the DF Lenders. Mr. Cooper is a managing partner of Dominion Fund V, one of the DF Lenders. He testified regarding his knowledge of the DF Lenders' investments, the Bridge Loan and other matters. Mr. Cooper particularly testified regarding the proposed offer by the DF Lenders to buy the Debtor's assets. He testified that the DF Lenders would not buy the assets unless they were free and clear of liens and interests. He concluded that if the

prospect of a pending lawsuit (particularly from Ms. Lewis) is transferred with the assets, he would recommend against purchasing the assets.

Two parties oppose the sale of the Debtor's assets to the DF Lenders: Ms. Lewis, the former CEO; and a group of shareholders led by Ms. Lewis, who will lose their equity interest in the assets under the Purchase Agreement. The objections of Ms. Lewis and the other shareholders revolve around three contentions: (1) the sale lacks good faith and is not for fair and reasonable value; (2) the purchase price is based on what the shareholders believe to be an improper credit in violation of § 363(k) because the "debt" bid by the creditor should be recharacterized as equity, or the debt should be equitably subordinated, and, or alternatively, the secured claims were improperly filed; therefore, the credit bid is illusory; and (3) elimination of successor liability claims is improper, in part, because the sale transaction requires the Debtor to release claims against the DF Lenders even though the Debtor has made no effort to investigate or quantify such claims.

Amy Lewis testified on behalf of the objecting parties. Ms. Lewis, as the former CEO, criticized the proposed value of the company, particularly the source code, but did not undertake an evaluation herself. The Court also heard testimony that a successor liability claim could tarnish the assets. Finally, Ms. Lewis testified that discussions took place wherein the DF Lenders indicated they intended to provide enough funding to operate the Debtor through 2002.

### III. DISCUSSION

In order to approve a sale of substantially all the Debtor's assets outside the ordinary course of business, the following elements must be met. The Debtor must show (1) that a sound business rea-

son exists for the sale; (2) there has been adequate and reasonable notice to interested parties, including full disclosure of the sale terms and the Debtor's relationship with the buyer; (3) that the sale price is fair and reasonable; and (4) that the proposed buyer is proceeding in good faith. *See e.g., In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D.Del.1991); *WBQ Partnership v. Virginia Dep't of Med. Assistance Serv. (In re WBQ Partnership),* 189 B.R. 97, 102 (Bankr.E.D.Va.1995).[6] The Court considers each element in determining whether the Debtor has met its burden.

### A. Sound Business Reason

#### (1) Sale of substantially all assets under § 363(b) outside a plan.

[2] Section 363(b) provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

The plain meaning of the statute would imply that the bankruptcy court has unfettered discretion in approving sales outside of an approved plan of reorganization because the statute does not specifically set forth that limitation. The Court, however, agrees with the majority of bankruptcy courts in accepting the boundaries set by the Second Circuit Court of Appeals that requires "a judge determining a § 363(b) application [to] find from the evidence presented before him at the hearing a good business reason to grant such an application" to sell substantially all of a debtor's assets outside the confines of a confirmed plan. *Lionel,* 722 F.2d at 1063.[7]

[3] In *Lionel,* the court enumerated several factors a judge may wish to consid-

---

**6.** Many courts have held that Section 363(b) requires these prerequisites in order to approve a sale of substantially all of a debtor's assets outside a confirmed plan. *See In re W.A. Mallory Company, Inc.,* 214 B.R. 834 (Bankr.E.D.Va.1997) ("This Court follows the 'sound business purpose' test when examining § 363(b) sales."); *See also Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir. 1986); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir.1983). Two courts within the Tenth Circuit, decided near the same time as *Lionel,* fashioned similar tests in determining when to allow a sale or lease outside the ordinary course of business. *See In re Ancor Exploration Co.,* 30 B.R. 802, 808 (N.D.Okla. 1983) (concluding that a "bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business" and specific findings made regarding the emergency nature of the sale, whether other prospective purchasers had been solicited and whether the sale is in the best interests of the estate); *In re Allison,* 39 B.R. 300, 303 (Bankr.D.N.M.1984) (determining that the court must find that "reasonable and adequate notice must be given to all interested parties," the proposed sale or lease must be

"economically reasonable" and that objecting parties will not be able to defeat a plan of reorganization).

**7.** A number of courts considering asset sales within a Chapter 11 case but before plan confirmation agree with *Lionel* in holding a good business reason must justify the sale. *See Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 387 (2nd Cir.1997) ("A sale of a substantial part of a Chapter 11 estate other than in the ordinary course of business may be conducted if a good business reason exists to support it. Purchasers of these assets are protected from a reversal of the sale on appeal so long as they acted in good faith.") (citations omitted); *The Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.),* 780 F.2d 1223, 1226 (5th Cir.1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *Stephens Indus., Inc.,* 789 F.2d at 390 (specifically adopting the *Lionel* test in holding that "a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1)

er in making his or her determination regarding whether a good business reason exists to approve the sale. These factors include:

> (1) the proportionate value of the asset to the estate as a whole; (2) the amount of elapsed time since the filing; (3) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (4) the effect of the proposed disposition on the future plans of reorganization; (5) the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property; (6) which of the alternatives of use, sale or lease the proposal envisions; and *(7) most importantly perhaps, whether the asset is increasing or decreasing in value.*

*Id.* at 1071 (enumeration and emphasis added).

There was sufficient evidence presented at the September 26 Hearing to warrant approval of an asset sale. Although the list from *Lionel* is not exhaustive, it provides adequate guidance in most cases considering a sale outside of an approved plan. The last factor, whether the asset is increasing or decreasing in value, is an important consideration in this case.

Testimony presented at trial, and the Examiner's report, pointed to a substantial decrease in value if the assets are not sold immediately. The Examiner stated that potential and existing customers would be reluctant to purchase services and goods from a company in tenuous financial condition for fear that future needs would not be met. In addition, the Examiner testified regarding his belief that the company would be unsustainable as a going concern without additional capital—which is unavailable. If the company ceased as a going concern, OfficeRX, among others,

would receive rights to the Debtor's source code, the Debtor's most valuable asset. The effect would be a severe devaluation of the code's value, thus severely devaluing the Debtor's total assets. Because the assets' value is reducing rapidly, the Court finds that there is a "good business reason" for granting the Debtor's application to sell assets outside a confirmed plan.

The other *Lionel* factors do not warrant withholding sale approval. The evidence presented conclusively showed that the Debtor had insufficient capital to reorganize, and would liquidate without the sale to the DF Lenders. Thus, an analysis regarding the likelihood of an effective reorganization is moot. Likewise, an analysis of the appraised value compared to the sale value is moot because the evidence presented as to current valuation was inconsistent and dated. Additionally, any appraised value must take into account the fact that the company was marketed extensively throughout the last year with no serious offers to purchase.

Another factor, the proportionate value of the asset to the total assets of the Debtor, appears to favor the objecting parties. The Debtor's business value is high because it is effectively its only marketable asset. This appears to be a case where the Debtor is not a company with extensive property, plant and equipment; but rather a single-product-centric endeavor focused on developing one software product. Finally, it is obvious that the time between filing the plan, and the proposed sale is short. The exigencies of the case, however, dictate a shorter time period because, as discussed above, the asset has a narrow window of marketability and, additionally, the Debtor has been marketing the company for some time. The other

when a sound business purpose dictates such action").

*Lionel* factors support a finding of a good business reason to justify the sale.

### B. Adequate and Reasonable Notice

Finally, Ms. Lewis and other shareholders seek to disqualify the DF Lenders as eligible purchasers because the DF Lenders have failed to give effective notice. The Court agrees that the notice has been short in contemplation of this sale. However, the Court heard extensive testimony regarding the attempts to distribute notice to all possible parties and, under the circumstances, the Court finds notice to be appropriate in all respects as previously determined in its September 9, 2002 Order.

### C. Sale Price is Fair and Reasonable

The sale price, as set forth in the Court's September 9, 2002 Order, as well as the Purchase Agreement, consists of cancellation of the DF Lender's secured pre-petition indebtedness, approximately $3,200,000; cancellation of the DF Lender's post-petition secured claim, approximately $500,000; cash of $100,000; additional cash not to exceed $22,000 to pay pre-existing liens; $1,100,000 in contracts assumption; and up to $85,000 to cover Chapter 11 unpaid administrative expenses.[8] The objecting parties argue this consideration is inadequate for a number of reasons.

### (1) The Validity of the Credit Bid

First, Ms. Lewis and the shareholders object to the DF Lenders using secured claims arising from the previous Bridge Loan to purchase the Debtor's assets through a "credit bid." Section 363(k) of the Bankruptcy Code states:

At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale and if the holder of such claim purchases such property such holder may off-set such claim against the purchase price of such property.

■■ In their objection to the sale, the shareholders quote *Bank of Nova Scotia v. St. Croix Hotel Corp. (In re St. Croix Hotel Corp.)*, 44 B.R. 277, 279 (Bankr. D.V.I.1984), for the proposition that § 363(k) only permits those with a valid security interest to claim a setoff and the Court agrees with this assessment. The shareholders argue that the DF Lenders do not have a valid security interest because they have failed to properly file their secured claim. However, a proof of claim is deemed filed under § 501 for any claim or interest that appears in the schedules filed under §§ 521(1) or 1106(a)(2) except a claim or interest that is scheduled as disputed, contingent or unliquidated. *See* 11 U.S.C. § 1111(a). The Debtor filed schedules pursuant to § 521(1) listing the DF Lenders' claims as secured claims that are not contingent, unliquidated, or disputed. Section 502(a) provides that the claim is deemed allowed unless a party in interest objects. No party has objected to the DF Lenders' claims. The Court finds that the DF Lenders hold a valid security interest in the Debtor and may claim a right to setoff.

The Debtor also argues with the contention that the purchase agreement is a "credit bid" within § 363 because there is not a "third party" involved, and because the purchase agreement provides for the

---

8. The consideration contemplated by the Debtor and the DF Lenders also includes certain claim waivers by the DF Lenders. This amount is unliquidated, but could be very

sizable. However, the Court makes its determination regarding the reasonableness of the terms based on the liquidated amounts as set forth above.

release of unsecured claims as well as the secured claims. The Debtor argues that the unsecured creditors will be in a better position without a "credit bid" characterization because if the purchase agreement is characterized as a "credit bid," and the assets are deemed to be worth less than the credit bid, the DF Lenders would retain a general unsecured claim for the deficiency. The deficiency claim would dilute the value of the sale for the Debtor's general unsecured creditors. Although the Court has the power to deem otherwise, the Court can find no reason to characterize the Purchase Agreement as anything other than a "credit bid" under § 363(k) of the Code other than to protect the Lender, in the event that the debt offered in the credit bid is recharacterized as equity. The Court finds that the Purchase Agreement negotiated by the Debtor and the DF Lenders constitutes a "credit bid" under § 363(k).

Ms. Lewis also argues that the Bridge Loan should be recharacterized as equity, or, alternatively, equitably subordinated. This would force the DF Lenders to purchase the Debtor's assets with new funds, rather than by offsetting the debt the DF Lenders previously extended to the Debtor.

### (2) Recharacterization

■ Although there is a split in opinion as to whether the Bankruptcy courts have power to recharacterize claims, the Tenth Circuit Court of Appeals (the "Tenth Circuit") has followed the majority of jurisdictions in holding that § 105(a) authorizes recharacterization through its general equitable powers. *See Sinclair v. Barr (In re Mid–Town Produce Terminal Inc.),* 599 F.2d 389, 393 (10th Cir.1979).

■ The Court could find no case in which the Tenth Circuit discussed recharacterization in a published opinion. However, Debtor's counsel directed the Court to an unpublished opinion wherein the Tenth Circuit determined that the factors considered in tax cases were useful in determining whether to recharacterize claims in a bankruptcy setting[9]. These factors include:

(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between the creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; (13) the failure of the debtor to repay on the due date or seek a postponement.

*Segal v. Ledyard (In re Ruff Fin. Servs., Inc.),* No. 97–4094, 1998 WL 813397, at *2, 1998 U.S.App. LEXIS 30137, at *6 (10th Cir. Nov. 25, 1998).

■ It is clear to the Court, from testimony and other evidence presented, that the Bridge Loan is a debt obligation, and should not be recharacterized as equity. Only factor (9), above, favors recharacterization. The identity of interest between the creditor and stockholder is an issue in this case because the amounts of money

---

**9.** Although the Court recognizes that this unpublished case is not binding, the Court specifically adopts the factors enumerated in that case when determining whether to recharacterize a debt claim.

loaned to the Debtor roughly corresponded to the DF Lenders' respective preferred stock ownership. On balance, however, the Court finds that the weight of the evidence supports the debt agreements as described, and will not recharacterize the loans to the Debtor by the DF Lenders as equity.

### (3) Equitable Subordination

 Ms. Lewis argues that the Court should equitably subordinate the Bridge Loan from the DF Lenders to the claims of other creditors. Section 510(c) of the Code grants a bankruptcy court the power to equitably subordinate a creditor's claim whose conduct has caused injury to the other parties or has afforded a creditor an unfair advantage over the other creditors. Because equitable subordination is remedial, not penal, and should be used sparingly, courts have devised a three part test in determining whether equitable subordination is appropriate. *See Carter–Waters Oklahoma, Inc. v. Bank One Trust Co., N.A. (In re Eufaula Indus. Auth.),* 266 B.R. 483, 488–89 (10th Cir. BAP 2001). This test requires findings that "(1) The claimant has engaged in inequitable conduct; (2) [t]he conduct has injured creditors or given unfair advantage to the claimant; and (3) [s]ubordination of the claim is not inconsistent with the Bankruptcy Code." *Id.* Ms. Lewis has not shown that any of these elements exist in the present case.

First, Ms. Lewis argues that the Bridge Loan is evidence of inequitable conduct. Just as an asset purchase by an insider is not bad faith per se, a loan by a majority shareholder in itself, is not inequitable. *See In re Mid–Town Produce Terminal, Inc.,* 599 F.2d at 392 (holding that, "loans by majority shareholders will not be subordinated to claims of other creditors absent inequitable conduct.... To hold that the debt may be subordinated on that basis alone would discourage owners from trying to salvage a business.") To equitably subordinate the debt, there must be more than just a loan from an insider to the Debtor. Inequitable conduct or bad faith, therefore, must be shown.[10]

Here, the examiner found no evidence of bad faith in the negotiations, and found no evidence that the creditor acted inequitably. Further, it is the Court's opinion, after hearing exhaustive evidence and cross-examination, that the DF Lenders and Debtor in this case acted in good faith—both during the negotiations for the Bridge Loan and the Purchase Agreement. Without any specific, credible evidence by the shareholders or Ms. Lewis of inequitable conduct, subordinating the DF Lenders' debt would be contrary to the principles of equity. Having heard no such evidence, the DF Lenders' claims may not be equitably subordinated.[11]

---

10. The Court is aware that case law imposes a lower burden of proof in showing inequitable conduct when the creditor is an insider. *See e.g., In re Eufaula Indus. Auth.,* 266 B.R. at 489 ("If the claimant is an insider or a fiduciary, the party seeking equitable subordination need only show 'unfair' conduct."); *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.),* 269 F.3d 726, 745 (6th Cir. 2001) (stating that " 'if the claimant is an insider, less egregious conduct may support equitable subordination' " but also emphasizing insiders may be " 'most interested in restoring and reviving the debtor, and such bona fide efforts should be viewed with approval' ") (citations omitted). As stated above, the objecting parties have not show any "unfair" conduct.

11. The Court notes that under the unusual circumstances and exigencies of this case, and because no proof of claim has been filed, it is appropriate to discuss the possibility of equitable subordination even though an adversary proceeding has not been filed in this case as required by Federal Rule of Bankruptcy Procedure 7001(8).

The Court finds the sale price, as proposed in the Purchase Agreement, to be fair and reasonable in all respects and that there is little or no evidence supporting a contention that a better price could possibly be found in the limited time available to the Debtor to market the business.

### D. Good Faith

As counsel for the shareholders pointed out, when a pre-confirmation § 363(b) sale is of all, or substantially all, of the Debtor's property, and is proposed during the beginning stages of the case, the sale transaction should be "closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization." *In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr.E.D.Mo.1990). Both Ms. Lewis and the other shareholders argue that because the asset sale is to a purported insider, the purchaser has a heightened responsibility to show that the sale is proposed in good faith and for fair value. *See In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr.E.D.Pa.1987) (holding that "the element of 'good faith' focuses principally on the element of special treatment of the debtor's insiders in the sale transaction and contemporaneous transactions therewith"). The Court agrees.

The Court has spent a considerable amount of time considering the question of good faith in this case. Under § 363(m), the purchaser of a Debtor's assets must be a good faith purchaser to enjoy the finality of a sale. The Tenth Circuit has determined that a "good faith" purchaser is "one that buys in good faith, and for value." *Tompkins v. Frey (In re Bel Air Assocs., Ltd.)*, 706 F.2d 301, 304 (10th Cir.1983). In *Bel Air*, the court found that, for the purposes of § 363(m), actions that destroy a purchaser's good faith include, "fraud, collusion between the purchaser and other bidders or trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.* at 305 n. 11 (citation omitted). *See also In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir.1986) (stating that the typical misconduct involves fraud or collusion).

Although Ms. Lewis and other shareholders have made allegations of bad faith, neither the Court, nor the Examiner, found any evidence to support those allegations. In part, Ms. Lewis points to the insider status of the DF Lenders as purchasers. However, as one court has stated, "[i]t is not bad faith per se for an insider to purchase property from an estate, even where the insider has a fiduciary duty to the estate." *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 842 (Bankr.C.D.Cal.1991); *see also In re Channel One Communications*, 117 B.R. at 496 (a sale may not *"unfairly* benefit insiders") (emphasis added). The Court has found none of the elements enunciated by the Tenth Circuit to destroy the DF Lenders' status as a good faith purchaser. After investigating the shareholders' claims, the Examiner found no evidence of collusion between the Debtor and the DF Lenders. The Court found neither collusion nor an attempt to take advantage of other bidders. Instead, the Debtor and the DF Lenders have made repeated and sustained attempts to market the Debtor to parties outside the sphere of insiders. Finding no willing purchasers, the Debtor negotiated at arms length with the DF Lenders for the purchase of the Debtor's assets.

In *Wilde Horse Enterprises*, the Court found that the question of good faith when an insider purchase of assets "turns on whether the debtor breached its fiduciary duty of full disclosure." 136 B.R. at 834;

*see also Polvay v. B.O. Acquisitions, Inc. (In re Betty Owens Schools, Inc.),* No. 96 Civ.3576(PKL), 1997 WL 188127, at *4 (S.D.N.Y.1997) ("[A] debtor-in-possession who proposes a sale of all of its assets to an insider must fully disclose the relationship between the buyer and the seller."). In the present case, the Debtor has disclosed all elements of the transaction, including the insider status of the proposed purchaser. In addition, the Debtor moved for the appointment of an examiner to make an independent evaluation. The Court finds that the Debtor acted in good faith, upholding their fiduciary duty of full disclosure to potential bidders, creditors and to the shareholders.

### E. Successor Liability

■ Finally, Ms. Lewis argues that if the sale is approved, that the sale cannot be "free and clear" of all liabilities because her pending civil suit against the Debtor continues to attach to the assets after the sale. Ms. Lewis claims that following the asset sale, the new company formed by the DF Lenders will be liable for any damages awarded in the pending civil suit under the theory of successor liability.[12]

■ Under general state law, when one corporation transfers assets to another, the purchaser is generally not liable for the seller's liabilities. This general rule is complicated in a bankruptcy proceeding where a court is asked to approve a sale under § 363. Balancing the counter-veiling interests of a purchaser, buyer, and claimant in an asset sale is no easy task. Too liberal an application of the "free and clear" provision in § 363 would allow a

seller to effectively avoid all liabilities through a transactional ruse, leaving claimants without remedy. At the same time, bona fide purchasers must be protected, and sales in a bankruptcy proceeding must have finality. Otherwise, creditors could simply follow the assets to a solvent company and seek repayment. Without adequate protection, purchasers would bid nominal amounts for assets to compensate for the risk of uncertainty thereby impairing the debtor's creditors with a lower sales amount.

Under § 363(f) of the code, the court has the power to order the assets of a seller to be transferred free and clear of all claims, including successor liability claims. Indeed, even before the Bankruptcy Code was enacted in 1978, courts relied on their general equitable powers to authorize the sale of assets free and clear. *See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D.Ohio 1987). The authority to sell free and clear is broad because it reflects a compelling policy intended by Congress in § 363. In *WBQ Partnership v. Virginia Dep't of Med. Assistance Serv. (In re WBQ Partnership),* 189 B.R. 97, 108 (Bankr. E.D.Va.1995), the Court found

> [T]he purpose behind the free and clear language is to maximize the value of the asset, and thus enhance the payout made to creditors. Without free and clear language, prospective buyers would be unwilling to pay a fair price for the property subject to sale; instead, the price would have to be discounted,

12. The Court is aware of significant legal discussion regarding the issue of successor liability in the context of a sale in bankruptcy. *See e.g.,* JoAnn J. Brighton, *How Free is "Free and Clear"? A Practical Guide to Protection Against Successor Liability When Purchasing Assets Out of a Bankruptcy Estate,* 21 Am. Bankr.Inst. 1 (Sept.2002); George W. Kuney, *Misinterpreting Bankruptcy Code Section 363(F) and Undermining the Chapter 11 Process,* 76 Am. Bankr.L.J. 235, 262 (2002) (arguing successor liability claims should not be eliminated upon a sale of assets outside a plan of reorganization).

perhaps quite substantially, to account for the liabilities that the buyer would face simply as a result of acquiring the asset.

Ms. Lewis relies heavily on the case of *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48 (7th Cir.1995). That case held that an intervening bankruptcy proceeding does not have a *"per se* preclusive effect" on a successor liability claim. *Id.* at 51. That case is distinguishable from the present case. In *Chicago Truck Drivers*, the union's pension fund attempted to recover a claim in the debtor's Chapter 7 case. It was unsuccessful and two years later the pension fund sued the new company, that had effectively foreclosed upon the debtor's collateral, on the basis of successor liability. The court determined that successor liability was not precluded but that the "availability of relief from the predecessor is a factor to be considered along with other facts in a particular case." *Id. Chicago Truck Drivers,* however, did not involve a sale under § 363, nor did the bankruptcy court have the opportunity to determine whether the assets should be sold "free and clear" of claims, including successor liability claims. In fact that case specifically states that it "does not directly implicate the Bankruptcy Code, since the underlying bankruptcy proceeding is long over." *Id.* at 50 n. 2.

In the present case, however, this Court must invoke § 363 and determine whether a sale can be made free and clear of successor liability claims. Under the broad policy that bankruptcy sales should be subject only to specific claims and that purchasers should have some comfort in the "free and clear" language of § 363(f), the Court finds that the Debtor's assets may be sold free and clear of all successor liability claims.

## IV. CONCLUSION

The Court approves the sale free and clear, including successor liability claims, as proposed by the Debtor. The Court finds a good business reason justifies the sale. In approving the sale, the court finds that there has been good faith on the part of the DF Lenders and the Debtor. The Court further finds that the Purchase Agreement negotiated between the Debtor and the DF Lenders constitutes a valid credit bid within § 363(k) and the sale price is deemed fair and reasonable.