A separate order consistent with this opinion is being entered herewith.

**In re ENRON CORP., et al.,**

**Official Committee of Unsecured Creditors of Enron Corp., et al., Appellants,**

v.

**Enron Corp., et al., Appellees.**

**No. 02 Civ. 3702(RCC).**

United States District Court, S.D. New York.

Sept. 26, 2005.

Martin J. Bienenstock, Weil, Gotshal & Manges LLP, New York City, for Enron Corp., Debtor.

Luc A. Despins, Susheel Kirpalani, Dennis C. O'Donnell, Milbank, Tweed, Hadley & McCloy, L.L.P., New York City, for Official Committee of Unsecured Creditors of Enron Corp., Appellants.

### MEMORANDUM & ORDER

CASEY, District Judge.

The Official Committee of Unsecured Creditors of Enron Corp. ("Committee") appeals an order of the Bankruptcy Court authorizing the retention and employment of the law firm Swidler Berlin Shereff Friedman, LLP ("Swidler") as Special Employees' Counsel to represent employees of Enron Corp. ("Enron") and its related entities (together, "Debtors"). The Bankruptcy Court approved the retention of Swidler based, among other things, on a finding that it was for a good business reason. Because that finding was not clearly erroneous, the order of the Bankruptcy Court is affirmed.

## I. BACKGROUND

This appeal arises out of Enron's Chapter 11 bankruptcy proceedings. Debtors sought an order on February 11, 2002 from the Bankruptcy Court authorizing the retention of Swidler as Special Employees' Counsel to represent certain cur-

rent and former Enron employees during investigations into Enron conducted by, among others, the Securities and Exchange Commission, Congress, the Department of Justice, and the Department of Labor. The application was for an order retroactive to December 10, 2001. The Committee, which was appointed by the United States Trustee, objected to the application. The Bankruptcy Court conducted an evidentiary hearing and heard testimony from Enron's President and Chief Operating Officer ("COO"), Jeffrey McMahon; and Michael Levy, a Swidler partner. The court also received affidavits from Levy and Carl S. Rauh, a partner at the law firm of Skadden, Arps, Meagher & Flom LLP ("Skadden Arps"), which represented the Debtors during the various investigations. On March 7, 2002, the Bankruptcy Court granted the application from the bench.

According to Rauh, Skadden Arps determined that independent legal advice was necessary for the many Enron employees who were required to give interviews and testimony during the governmental investigations of Enron. Subject to the Bankruptcy Court's approval, Swidler was asked to represent the employees who were not targets of the investigation but whose assistance in the investigations had been, or was likely to be, sought. At the time of the application there were 70 such employees; at the time of the hearing there were approximately 105 employees that Swidler had represented. At the time of the hearing, Swidler had performed approximately $1,700,000 worth of services in representing Enron employees. The Debtors reasoned that the expedient completion of the governmental investigations would be beneficial for their reorganization efforts and that independent counsel for the employees would facilitate the employees' cooperation with the investigations while reassuring the employees that their legal rights were protected. Swidler would not represent any employee, however, who became a target of any investigation.

At the hearing, McMahon testified that the he believed the best method to complete the bankruptcy proceedings and get back to business was to fully cooperate with the governmental investigations. McMahon also stated that it would be difficult to continue to retain employees because of the fear that the investigations caused, and that providing Swidler as counsel would ease the employees' concerns and encourage them to cooperate in the investigations. McMahon also testified that having one law firm represent all the employees, rather than various firms, would facilitate coordination of employee responses to things like document requests.

McMahon described the level of scrutiny to which Enron and its employees had been subjected during the pendency of the bankruptcy proceedings. For example, he described how the Department of Justice conducted an on-site investigation at Enron's Houston headquarters of allegations that employees at Enron had shredded documents adverse to the company. According to McMahon, "about 70 or 75 FBI agents descended upon the building one particular morning and [conducted] detailed interviews, private interviews with the employees. That was an extremely distressing situation to hundreds of employees during that time period." (JA tab 14 at 15:19–25.) Enron contacted Swidler, which sent attorneys to be present during the investigation. The motivation for asking Swidler's attorneys to be present, McMahon testified, was "so the employees would feel comfortable cooperating with the FBI, talking to the FBI and allowing the investigation to go forward as quickly as possible, knowing that they had their

own counsel representing them in the matter." (*Id.* at 16:6–10.) McMahon stated no employee quit during that particular investigation, which he attributed to Swidler's representation.

McMahon also testified that Enron management viewed the retention of Swidler as a service provided to employees to allay their fears about the investigation and allow them to focus their energies on their work. In McMahon's words:

> [The representation] is a service by which we are encouraging [the employees'] cooperation. We are providing [the employees] legal counsel on a personal level so they know they are not putting themselves in jeopardy, and they can do the right thing to move the investigation forward, so we can get it behind us, and they can spend most of their time doing what they need to do, which is adding value to the company and its stakeholders.

(*Id.* at 18:15–23; *see also id.* at 32:17–21 ("[W]e are trying to provide a service, a benefit to our employees by having the Swidler firm available for their use....")).

On cross-examination, McMahon revealed that Levy and Swidler had represented two former Enron executives, who had been fired, from approximately December 2001 or January 2002: Richard Causey and Richard Buy. Levy confirmed that his firm had represented the two executives until February 1, 2002. A third executive, J. Clifford Baxter, was also represented by Swidler, beginning in approximately January 2002 but had ceased to be represented at some point before the hearing.

McMahon acknowledged that some employees' testimony to investigators could be damaging to Enron. For example, Enron was engaged in litigation with a third-party corporation called Dynegy that claimed it had terminated a merger agreement with Enron after being misled by it. McMahon testified that employee testimony might support Dynegy's position and thereby harm Enron. In addition, Enron employees who were eligible to be represented by Swidler were also potential members of class actions against Enron alleging violations of the Employee Retirement Income Security Act. It was not established at the hearing which Enron decisionmakers were involved in retaining Swidler, or whether any of those individuals were direct beneficiaries of Swidler's services. McMahon testified that he did not know if any of the Enron executives who approved the retention of Swidler were potential beneficiaries of the firm's services. McMahon also testified that he was represented by Swidler, but that he was not a party to the decision to retain the firm.

The Debtors argued to the Bankruptcy Court that an order approving the retention of Swidler was supported by a "sunshine policy" in Chapter 11 cases, under which creditors have a right to know what caused the bankruptcy. To that end, the Debtors maintained that facilitating cooperation of Enron employees with the governmental investigations would help reveal the cause of losses to creditors. Retaining an attorney for the employees would also, according to the Debtors, encourage employees to cooperate with the assurance that Swidler's advice could help limit their personal exposure to prosecution.

The Committee opposed the retention of Swidler and suggested that it was an insider transaction because those who approved the retention included some who would benefit from Swidler's representation. In addition, the Committee argued that the retention of Swidler was not in the Debtors' best interests because some of the employees that Swidler represented might

provide testimony adverse to the economic interests of the Debtors.

The Bankruptcy Court ruled that the Debtors had established the need for retaining counsel for Enron employees during the governmental investigations. As to the potentially negative impact of some employees' testimony to the Debtors, the Bankruptcy Court found that the risk was outweighed by the benefits the representation carried with it. As the court put it, "[I]f [retaining Swidler] means at some point that information is provided that may have . . . a negative, economic impact upon the estate, I think that price has to be paid for the benefit of the system of information being provided . . . ." (*Id.* at 307:6–11.) The Bankruptcy Court further explained:

> I think the commitment has to be made to the employees, that to the extent they don't become targets of these investigations, . . . and in fairness and to facilitate as much information as possible or as much cooperation as possible, and also, within the context of that cooperation, people having an ability to protect their constitutional rights, that we would do what we can to facilitate it.

(*Id.* at 306:20–307:5.) The Bankruptcy Court also explained that it was the first time it had overruled a creditors' committee, but that it was necessary under the circumstances. The Bankruptcy Court thus held that the retention order was proper under sections 105(a), 327, and 363(b)(1) of the Bankruptcy Code.

The Committee raises a number of points on appeal: (1) whether the Bankruptcy Court erred as a matter of law in approving the retention of Swidler under 11 U.S.C. § 363(b)(1) because the retention benefitted insiders of the Debtors, because that statute cannot be used to approve the payment of legal fees, and because the retention was not in the best interests of the Debtors; (2) whether the Bankruptcy Court's finding that the retention of Swidler was a sound exercise of the Debtors' business judgment was erroneous; and (3) whether the Bankruptcy Court erred as a matter of law in approving the retention of Swidler under 11 U.S.C. § 327(e). In light of the Court's conclusions on the first two issues, it need not reach the third issue.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The Court has jurisdiction to review the Bankruptcy Court's order authorizing retention of Swidler because it is a final order within the meaning of 28 U.S.C. § 158(a)(1). District courts review findings of fact by bankruptcy judges for clear error; all rulings of law are reviewed de novo. *In re Teligent Inc.*, 324 B.R. 479, 486 (S.D.N.Y.2005).

### B. Application of the Business–Reason Test Was Appropriate

Section 363(b)(1) of the Bankruptcy Code provides that a trustee "may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing that debtors in possession have "all the rights . . . of a trustee"). "Section 363 . . . governs the use of funds by the debtor in possession while it operates its business after the bankruptcy petition is filed." *In re Bethlehem Steel Corp.*, No. 02 Civ. 2854(MBM), 2003 WL 21738964, at *10 (S.D.N.Y. July 28, 2003). Section 105(a) provides the authority for the bankruptcy court to carry out the provisions of § 363(b). *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). For a court to ap-

prove an application under § 363(b), it must "expressly find from the evidence presented before [it] at the hearing a good business reason to grant such an application." *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir.1983). In doing so, the court must "consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders." *Id.*

■ The Committee maintains that the retention of Swidler must be subjected to heightened scrutiny because Enron insiders who made the decision to retain the firm stand to benefit from the representation. Courts have held that transactions that benefit insiders must withstand heightened scrutiny before they can be approved under § 363(b). *See, e.g., In re Manchester Gas Storage, Inc.*, 309 B.R. 354, 378 (Bankr.N.D.Okla.2004) ("When the representative of the debtor in possession, a fiduciary, invokes a provision in an employment contract favorable to himself and unfavorable to the estate, the insider transaction should at the very least be disclosed to the creditors and the Court for scrutiny."); *In re Med. Software Solutions*, 286 B.R. 431, 445 (Bankr.D.Utah 2002) (holding that under § 363(b) when transactions benefit insiders, "the purchaser [of the asset] has a heightened responsibility to show that the sale is proposed in good faith and for fair value"); *In re Wingspread Corp.*, 92 B.R. 87, 93 (Bankr. S.D.N.Y.1988) (holding that insider transactions under § 363(b) "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse").

■ The Bankruptcy Court noted that retaining Swidler was necessary to facilitate the Debtors' cooperation with the governmental investigations and to retain employees who feared prosecution, both of which the Debtors had determined was in their best interests, without resolving whether the transaction was approved by insiders who would benefit from it. But the Committee failed to meet its burden to produce evidence that the retention of Swidler was an insider transaction subject to heightened scrutiny. "While a debtor applying under § 363(b) carries the burden of demonstrating that a use, sale or lease out of the ordinary course of business will aid the debtor's reorganization, an objectant ... is required to produce some evidence respecting its objections." *In re Lionel Corp.*, 722 F.2d at 1071. Despite the Committee's argument to the contrary, it did not produce any evidence at the hearing that insiders who made the decision to retain Swidler benefitted from the representation.

The Committee maintains that: (1) McMahon's testimony established that the decision was made by those who would benefit from Swidler's representation, and (2) McMahon and Levy testified that Causey, Buy, and Baxter, who were insiders of the Debtors, benefitted from Swidler's retention. The Court disagrees.

The first assertion is incorrect. McMahon did not testify that insiders participated in the decision to retain Swidler. McMahon's cross-examination on the subject proceeded as follows:

Q. [W]as anyone not a potential beneficiary of these services involved in the decision to retain Swidler Berlin?

A. I don't know the answer to that because I don't know all who was involved in that decision.

. . . .

Q. So there was no party that was not a potential user of those services that was involved in the decision to retain [Swidler]?

A. Yes—well, again, I just don't know who was involved in that decision. (JA tab 14 at 127:4–9, 127:14–18.) The Committee argues here, as it argued to the Bankruptcy Court, that McMahon affirmatively stated that all involved in the decision to retain Swidler would be Swidler clients. But McMahon twice said that he did not know the answer to the question.

Similarly, there was no evidence that Causey, Buy, or Baxter was involved in the decision to suggest that it was an insider transaction. There may have been evidence that Causey, Buy, and Baxter were Swidler clients for short periods of time, but the Committee did not present evidence that any of those three individuals participated in the decision to retain Swidler. Again, the record is barren as to who at Enron approved the retention. Indeed, the only evidence about the decision suggests that retaining Swidler was the idea of attorneys at Skadden Arps and not any insider.

The Committee therefore failed to present sufficient evidence that this was an insider transaction. The Bankruptcy Court was accordingly correct to apply the business-reason test to determine whether the retention of Swidler was permissible.

## C. Section 363(b) is a Proper Source of Authority For the Retention Order

 The Committee also argues that the order permitting retention of Swidler was incorrect as a matter of law because § 363(b)(1) cannot be invoked to approve legal fees. That is so, the Committee maintains, because the bankruptcy code contains provisions that specifically address legal fees. Pursuant to 11 U.S.C. § 327(e), a debtor in possession may retain an attorney to represent it with the court's permission "for a specified special purpose" if the attorney's interests are not adverse to the debtor's. The Committee maintains that § 327(e) only allows the retention of an attorney to represent the debtor and not the debtor's employees, and that § 363(b) cannot be used to circumvent the limits of § 327(e).

 As the court in *In re Bethlehem Steel Corp.*, No. 02 Civ. 2854(MBM), 2003 WL 21738964 (S.D.N.Y. July 28, 2003), explained, "[t]he authorization of certain types of payments under § 363(b) is not prohibited simply because there is another section of the Bankruptcy Code related to the same type of payment." *Id.* at *11. Nothing in § 327(e) suggests that Congress intended it to be the exclusive authority for approving the payment of legal fees in the bankruptcy code. And, as the Committee itself emphasizes, § 327(e) is directed to the retention of an attorney to represent the debtor, not third parties such as the debtor's employees. Even if Congress intended § 327(e) to be the exclusive means for a debtor to retain an attorney for purposes other than bankruptcy representation, there is nothing to suggest that congressional silence on retention of attorneys for debtors' employees in § 327(e) was meant to foreclose such authority under § 363(b). The Court therefore agrees with the conclusion reached in *In re Bethlehem Steel Corp.* that a transaction outside the ordinary course of business may be approved under § 363(b) if the transaction meets the requirements of that section, even if another provision of the code touches upon the subject matter of the transaction. *See id.* at *11.

## D. The Finding that a Good Business Reason Supported the Retention Was Not Clearly Erroneous

 The application of the business-reason test under *In re Lionel Corp.* was correct as a matter of law. The Bankrupt-

cy Court's finding that the Debtors established such a reason for the retention of Swidler must be upheld unless it is clearly erroneous. *See In re Teligent Inc.*, 324 B.R. at 486. The Court concludes that it was not. The record before the Bankruptcy Court revealed three main reasons for the retention of Swidler: (1) it would facilitate employees' cooperation and therefore allow the governmental investigations to be completed as quickly as possible, (2) it would better allow employees to focus their time and energy on their work, and (3) it would contribute to the Debtors' retaining employees. The Bankruptcy Court also evaluated the effect of the ruling on the creditors and the business reasons for the transaction in light of the unprecedented government scrutiny that Enron and its employees were receiving. The record supports the finding that the retention was for a good business reason.

McMahon explained that he believed it was in the Debtors' best interests to complete the governmental investigations as soon as possible and get back to business. In furtherance of this goal, the Debtors, with the advice of Skadden Arps, determined that the assistance of independent counsel for employees was necessary and appropriate. McMahon testified that Swidler's representation would help employees know their rights with regard to the governmental investigations and to therefore cooperate more fully and remain as focused as possible on their work.

The decision to retain Swidler as Special Employees' Counsel was thus meant to reduce information and other transaction costs associated with a large number of employees cooperating with the investigations. There would be transaction costs associated with the employees' distraction by the investigations and unease about their legal rights. Information costs would normally be incurred by the em-

ployees, who would have to seek out and pay counsel to learn about their rights or forego such advice and remain uncertain about their rights. But the Debtors would also incur costs for two reasons: (1) the process of bringing to light the corporate malfeasance at Enron would be less efficiently completed while employees' energies were focused upon seeking and retaining counsel, and the hesitation to give complete testimony that would follow; and (2) employees would be less focused on their jobs and more on worrying about finding a lawyer and learning about their legal rights. Swidler's services would, in the Debtors' judgment, reduce information and other transaction costs by eliminating the need for employees to spend resources seeking and retaining counsel or foregoing representation, the latter resulting in less cooperation with investigators out of fear, facilitated by ignorance, that thorough and forthcoming answers might be harmful to the employees' self-interest. It would allow employees to, as McMahon put it, "spend most of their time doing what they need to do, which is adding value to the company and its stakeholders." (JA tab 14 at 18:21–23.)

The Debtors also reduced transaction costs that would be associated with negotiations among multiple parties by hiring one firm for all employees. Instead of requiring the investigators to contact 105 employees or their attorneys (depending on how many employees chose to retain counsel), they need only contact Swidler, thus reducing the time and effort of coordinating things like production of documents and employee testimony. Furthermore, the qualifications of Swidler's attorneys are undisputed. The hearing revealed that Levy, who leads the representation, is a former Assistant U.S. Attorney and Deputy Assistant Secretary at the Department of Housing and Urban Development, and clerked for a

U.S. district judge and former Supreme Court Justice Louis Powell. He thus has established credentials and experience with governmental investigations. Levy's qualifications reduce the likelihood that nontarget employees will receive poor legal advice that might result in the under- or overinvocation of Fifth Amendment rights.[1] Retention of Swidler is reasonably related to furthering the goal of accelerating the governmental investigations through providing the optimal level of employee cooperation. Therefore, the Bankruptcy Court was not improperly focusing on the protection of employees' constitutional rights in approving the retention of Swidler because the competent explanation of those rights to the employees is also in the best interests of the Debtors.

The Bankruptcy Court explained that it was difficult, *ex ante*, to quantify the costs of Swidler's representation in terms of producing information adverse to the estate. That is so for multiple reasons, one of which is that it is impossible to know before approving the retention how many employees will reveal information harmful to the financial interests of the estate. The Bankruptcy Court concluded, however, that the Debtors were reasonable in choosing to pay for Swidler's services in their effort to encourage cooperation and keep employees from being too distracted by the investigations. The Bankruptcy Court's judgment that the Debtors were reasonable in that assessment, and hence had a good business reason for retaining Swidler, must stand unless that judgment is clearly wrong. *See Pearl–Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 580 (S.D.N.Y.2001) ("The Bankruptcy Court's choice between two permissible views of the facts cannot be held to be clearly erroneous."). This Court cannot say that it is.

McMahon also testified that he believed retaining Swidler would assist the Debtors in keeping employees who otherwise might leave out of fear of the investigations. The Committee argues that this reasoning is insufficient to support the decision because Swidler was retained to represent former employees of the Debtors as well, and the investigators have the power to reach ex-employees. Thus, the presence of Swidler would not motivate rational actors to stay in the Debtors' employ because quitting would not necessarily leave them without the benefit of Swidler's services. However, the hearing established that the Debtors were also concerned about the work environment that the investigations created. For example, McMahon explained that he believed that without Swidler's representation, "lots of employees ... would have just said, 'This is not worth being in this building, not worth working for this company at this point in time,' and left the firm." (*Id.* at 16:12–15.) Thus, the Debtors were not just attempting to allay employees' fears of personal prosecution but also to reduce the stress that working in the Enron environment produced and to improve morale. This latter reason is not undermined by extending the scope of Swidler's representation to former employees.

In addition, McMahon testified that the retention of Swidler was a benefit or service that the Debtors were providing to their employees. Retaining counsel for the employees' benefit, like other employee benefits, is calculated to stimulate good will between employer and employees. In other words, the Debtors determined that providing Swidler as a service will increase their employees' valuation of their jobs.

---

1. The Bankruptcy Court noted the importance of providing the employees with "competent" counsel to the goal of furthering cooperation. (JA tab 14, at 311:20–24.)

McMahon's testimony established some empirical evidence, uncontradicted by the Committee, that the retention of Swidler did lead employees to remain with the Debtors. Even without such evidence, all that need be decided is whether the Debtors' prediction that the retention of Swidler would lead more employees to stay than to leave is a good business reason for providing Swidler's services.

*In re Montgomery Ward Holding Corp.*, 242 B.R. 147 (D.Del.1999), supports the conclusion that the Debtors had a good business reason for retaining Swidler. There, the court upheld an order approving an employee-retention program because stabilizing employee turnover, boosting employee morale, and retaining key employees were essential to the debtors' reorganization and therefore good business reasons for the program. *Id.* at 155. The bankruptcy court in that case was also confronted with a situation in which "inordinate" negative publicity strained the debtor-employee relationship. *Id.* The bankruptcy court deferred to the debtors' business judgment that the benefits of the retention program outweighed its costs. *Id.* Similarly, the Bankruptcy Court here deferred to the Debtors' judgment that hiring attorneys to represent its employees would help them retain employees and boost morale. That finding was not clearly erroneous.

Finally, the Bankruptcy Court correctly focused on the unique circumstances of this case, especially the unprecedented scrutiny of Enron by governmental investigators and the impediment that the scrutiny posed to resumption of the Debtors' ordinary business, while balancing the effect of the ruling on the creditors. The Bankruptcy Court's tailoring of its decision to the peculiar facts of the case in determining whether a good business reason existed to approve the transaction is entitled to deference. "[A] bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code." *In re Lionel Corp.*, 722 F.2d at 1069. Thus, "a bankruptcy judge must have substantial freedom to tailor his orders to meet differing circumstances." *Id.* In the difficult circumstances that the unprecedented public scrutiny of Enron created, the Bankruptcy Court's exercise of its power was appropriate and is due deference from this Court. And, as the Bankruptcy Court explained, it was concerned that the decision overruled the asserted interests of the creditors. But it found those interests outweighed by the goals that the retention would further, including the goal of allowing the Debtors to get back to business, which is in the creditors' interests. The Bankruptcy Court's decision therefore satisfied the requirements of *In re Lionel Corp.*

## III. CONCLUSION

For the foregoing reasons, the order of the Bankruptcy Court approving the retention of a Special Employees' Counsel for the Debtors' employees is affirmed.